ROBERT A. FAIRBAIRN & others, trustees, *vs.* PLANNING BOARD OF BARNSTABLE.

Barnstable.    November 10, 1976. — March 4, 1977.

Present: HALE, C.J., GRANT, & BROWN, JJ.

*Subdivision Control. Practice, Civil,* Subdivision control appeal, Extraordinary review. *Health, Board of.*

The disapproval of a definitive subdivision plan by a town's board of health warranted the planning board's disapproval of the plan. [173-174]

The determination of all health questions with respect to the disposal of sewage in a proposed subdivision which would not be connected to a municipal sewer was vested exclusively in a town's board of health under G. L. c. 41, § 81U, and so much of a planning board's regulations which purported to require the satisfaction of the planning board as to sewage disposal facilities was invalid as "inconsistent with the subdivision control law" within the meaning of c. 41, § 81Q. [176]

A finding by a town's planning board that proposed storm drains, culverts, and related installations in a subdivision plan were not adequate was not sufficient to warrant disapproval of the plan where the board made no finding that the plan's design of storm drains and related installations did not meet the requirements of the town's engineering department pursuant to the relevant regulation of the board. [176-177]

Disapproval of a subdivision plan by a town's planning board was not justified by a finding that there was a danger of pollution of adjacent wetlands where there was no rule or regulation of the board respecting such matter. [177]

A finding by a town's planning board that a subdivision plan "fail[ed] to show the location of all existing natural features within or adjacent to and significantly affecting the layout of the area proposed to be subdivided, specifically bodies of water, streams, swamps and marshes," as required by a planning board regulation, was sufficiently specific to comply with the provisions of G. L. c. 41, § 81U. [177-178]

Disapproval of a subdivision plan by a town's planning board was not justified by a finding that the developer failed to demonstrate that an adequate supply of water for fighting fires would be available to the subdivision where there was no rule or regulation of the board respecting such matter. [178]

Disapproval of a subdivision plan by a town's planning board was not justified by a finding that a proposed entrance to a public way constituted a dangerous intersection where there was no rule or regulation of the board respecting such matter. [179]

The validity of a disapproval of a subdivision plan by a town's board of health which was adopted by the planning board as a reason for disapproving the plan was *not* placed in litigation by the developer's appeal from the decision of the planning board under the provisions of G. L. c. 41, § 81BB. [180-181]

Discussion of the procedural due process which a town's board of health is required to afford a developer of a subdivision prior to formulating an adverse recommendation to a planning board pursuant to G. L. c. 41, § 81U. [181-183]

BILL IN EQUITY filed in the Superior Court on August 24, 1973.

The suit was heard by *Nelson, J.*

*James J. Marcellino* (*Brian A. O'Connell* with him) for the plaintiffs.

*Henry L. Murphy, Jr.,* Town Counsel (*John Murphy* with him) for the defendant.

GRANT, J. This case arises out of the plaintiffs' efforts to obtain the necessary approvals under the Subdivision Control Law (G. L. c. 41, §§ 81K-81GG) of a plan by which the plaintiffs propose to subdivide into 169 residential house lots the major portion of a tract of some 230 acres of land owned by the plaintiffs and lying in the westerly part of the town of Barnstable. The plaintiffs filed a definitive subdivision plan with the planning board on June 18, 1973. As required by G. L. c. 41, § 81U, a copy of that plan was duly filed with the town's board of health. The planning board conducted a public hearing on the plan (G. L. c. 41, § 81T) on July 23, 1973. By its letter to the planning board of August 13, 1973, the board of health indicated its disapproval of the plaintiffs' plan for reasons which we shall consider in part at a later point in this opinion. On the same day the members of the planning board voted unanimously to disapprove the plan. By

its letter of August 14 to the town clerk, the planning board stated that it had "adopt[ed] the report of the [b]oard of [h]ealth as a part of its reasons for voting disapproval" and listed five additional reasons for its disapproval. The plaintiffs duly appealed to the Superior Court from the decision of the planning board. G. L. c. 41, § 81BB. A judge of that court entertained oral and documentary evidence, filed findings of fact and conclusions of law, and ordered the entry of a judgment sustaining the decision of the planning board. The plaintiffs have appealed from the ensuing judgment. The evidence is reported. We affirm the judgment.

1. The course followed by the judge in hearing and deciding the plaintiffs' appeal was procedurally correct. It is well settled that the duties of the Superior Court in hearing and deciding appeals under § 81BB are to conduct a hearing de novo, find the relevant facts, and, confining its review to the reasons stated by the planning board for its disapproval of the subdivision plan (*Canter* v. *Planning Bd. of Westborough,* 4 Mass. App. Ct. 306, 307 [1976]), determine the validity of the board's decision. *Rettig* v. *Planning Bd. of Rowley,* 332 Mass. 476, 478-489 (1955). *Kuklinska* v. *Planning Bd. of Wakefield,* 357 Mass. 123, 130 (1970). *Mac-Rich Realty Constr. Inc.* v. *Planning Bd. of Southborough,* 4 Mass. App. Ct. 79, 81 (1976). See also *Strand* v. *Planning Bd. of Sudbury, ante,* 18, 21-24 (1977). It is also settled that the developer has the burden of proving that the planning board has exceeded its authority in disapproving the plan. *Mac-Rich Realty Constr. Inc.* v. *Planning Bd. of Southborough,* 4 Mass. App. Ct. at 83.

2. Basically, the first reason given by the planning board for disapproving the plaintiffs' plan was that the plan had already been disapproved by the board of health for reasons stated by the latter board in its letter of August 13, 1973. The planning board's action in this respect was correct. A planning board may not approve a subdivision plan which does not comply with the recommendation of the board of health; the planning board's options in such a

case are limited to those of disapproving the plan or modifying it in such fashion as to bring it into conformity with the recommendation of the board of health.[1] G. L. c. 41, §§ 81M and 81U. See *United Reis Homes, Inc.* v. *Planning Bd. of Natick,* 359 Mass. 621, 622-623 (1971). Compare *Rounds* v. *Water & Sewer Commrs. of Wilmington,* 347 Mass. 40, 43 (1964); *Garabedian* v. *Water & Sewerage Bd. of Medfield,* 359 Mass. 404, 406 (1971).

3. The planning board's second reason for disapproving the plaintiffs' plan was that the "[b]oard finds that based on the evidence presented at the public hearing regarding soil structure, on-site examination by [b]oard [m]embers, and the lack of adequate proof offered by the developer, warrants the finding that the proposed on-site sewage disposal facilities are not satisfactory pursuant to Section III, Paragraph 4, Subparagraph (C) 3 of the Subdivision Rules and Regulations." That section reads: "Any lot so located that it cannot be served by a connection to a municipal sewer system shall be provided with on-site sewerage disposal facilities satisfactory to the Board of Health *and the Planning Board*" (emphasis supplied). We need not decide whether so much of this rule or regulation as purports to require the satisfaction of the planning board is sufficiently definite to apprise developers "in advance what is or may be required of them and what standards and procedures will be applied to them" (see *Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield,* 344 Mass. 329, 331-334 [1962]; *Chira* v. *Planning Bd. of Tisbury,* 3 Mass. App. Ct. 433, 438-439 [1975]), because we are of opinion that the planning board has misconceived its duties and functions in a case such as the present, where the proposed development lies entirely within an area which is not served by municipally owned sewers and in which an individual sewage disposal system will have to be constructed on each house lot.

---

[1] The second option would not have been feasible in the circumstances of this case.

The first sentence of G. L. c. 41, § 81M, recites that "[t]he subdivision control law has been enacted for the purpose of protecting the safety, convenience and welfare of the inhabitants of the cities and towns ... by regulating the laying out and construction of ways in subdivisions ... and ensuring sanitary conditions in subdivisions...." That sentence, standing by itself, contains no allocation of duties and functions as between a planning board and a board of health in "ensuring sanitary conditions in subdivisions." The second sentence of § 81M speaks of a planning board's exercising its powers under the Subdivision Control Law "with due regard ... for securing adequate provision for ... sewerage," but only in the context of such a board's other duties and functions with respect to the ways in a subdivision. The first sentence of G. L. c. 41, § 81U (as most recently amended by St. 1972, c. 749, § 1), requires a developer to submit a copy of his definitive subdivision plan to the board of health when he submits the original of the plan to the planning board. The second sentence of that section contemplates that the board of health "shall report to the planning board in writing approval or disapproval of said plan, and in the event of disapproval shall make specific findings as to which, if any, of the lots shown on such plan cannot be used for building sites without injury to the public health, and include such specific findings and the reasons therefor in such report, and, where possible, shall make recommendations for the adjustment thereof...." That same sentence concludes with a proviso to the effect that a planning board may proceed to act on a subdivision plan without receiving any report from the board of health "if a municipal sewerage system will service the proposed subdivision." The fourth sentence of § 81U is to the same general effect as the proviso of the second sentence; it contemplates the possibility that a planning board may not have the board of health's report in hand by the time of the public hearing required by § 81T. The fourth sentence of § 81U also contains the prohibition of a planning board's overriding the recommen-

dation of a board of health which has already been discussed in part 2 of this opinion. That prohibition is underscored by the third paragraph of § 81U, which provides that "[i]f the report of the board of health ... shall so require, the approval by the planning board shall be on condition that no building or structure shall be built or placed upon the areas designated without consent by such board of health...."

Reading the foregoing provisions together and in harmony with each other, we conclude that the determination of all health questions with respect to the disposal of sewage in a subdivision which will not be connected to a municipal sewer is vested exclusively in the board of health and that so much of the planning board's rule or regulation III, (4), (C), 3, as looks to the contrary is invalid as "inconsistent with the subdivision control law" within the meaning of G. L. c. 41, § 81Q. It follows that the second reason given by the planning board for its disapproval of the plaintiffs' plan cannot stand.

4. The critical portion of the third reason given by the planning board for its disapproval of the plan was that the proposed storm drains, culverts and related installations and the proposed sewage disposal systems "are not adequate to dispose of surface water and sewage in such a way as [not to] affect adjacent lands and lands in the subdivision which are wetlands and are subject to the Wetlands Protection Act." To the extent that this finding or reason is concerned with the proper disposal of sewage, it is legally irrelevant for the reasons already discussed in part 3 of this opinion. The only rule or regulation of the planning board which appears to have any relevance to the situation is § V, (10), (A), which provides as follows: "Storm drains, culverts, ditches, and related installations, including catch basins, gutters and manholes shall be installed as necessary to provide adequate disposal of surface water, from or in the subdivision and adjacent land; *as per the Town Engineering Department's requirements*" (emphasis supplied). The board made no finding that the plaintiffs' design of storm drains and related installations

did not meet the requirements of the town's engineering department.[2]

The planning board's third statement of reasons also includes the following: "The [b]oard specifically finds that there is a real danger of pollution of these adjacent wetlands from surface water run-off which would be substantially altered from the natural run-off now existing and by the seepage of sewage through the soil structure, and the threat to the Great Marsh and Barnstable Harbor would substantially harm the safety, convenience and welfare of the inhabitants of Barnstable and would create a menace to marine and vegetable life of all forms in the Great Marsh thereby severely damaging a major asset owned by the [t]own of Barnstable, enjoyed and used by inhabitants of the [t]own for recreation, fishing, boating, shell fishing, swimming and conservation." Prescinding again from any question of sewage, and recognizing that the board's fears were directed to matters of legitimate public concern, we have been unable to find any rule or regulation of the board which justified its refusal to approve the plan on any ground such as that just stated. See *Pieper* v. *Planning Bd. of Southborough*, 340 Mass. 157, 162-164 (1959); *Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield*, 344 Mass. at 332-333; *Canter* v. *Planning Bd. of Westborough*, 4 Mass. App. Ct. at 308. Contrast *Hamilton* v. *Planning Bd. of Lexington*, 4 Mass. App. Ct. 802, 803 (1976).

5. The fourth reason given by the planning board for disapproving the plaintiffs' plan was that it "fails to show the location of all existing natural features within or adjacent to and significantly affecting the layout of the area proposed to be subdivided, *specifically* bodies of water, streams, swamps and marshes, as required by Section IV, Para. 1, Subpar. (g)" and by § IV, (3), of the board's rules and regulations (emphasis supplied). The cited pro-

---

[2] To the contrary, there was evidence at trial from which the judge could have found that the plaintiffs' design did meet the requirements of the town's engineering department.

visions require that a definitive subdivision plan show the location of a number of features, including "bodies of water, streams, swamps, [and] marshes," as well as such features as "wooded areas, railroads, major highways, [and] airports." There was evidence at the trial in the Superior Court (introduced through a conservation officer and unchallenged by the plaintiffs) that the plan in question failed to reflect the existence of three streams, one of them approximately a third of a mile long, and a swamp approximately 125 feet long and fifty feet wide.

The plaintiffs argue that the board should have specified exactly what additional bodies of water should have been disclosed on the face of the plan. We think that the board, by citing the relevant sections of its rules and regulations and referring "specifically" to "streams" and "swamps," complied with the requirement of § 81U that "[i]n the event of disapproval, the planning board shall state in detail wherein the plan does not conform to the rules and regulations of the planning board."

6. The fifth reason for disapproval was stated as follows: "The [p]lanning [b]oard further specifically finds, based on testimony furnished by the [c]hief of the West Barnstable Fire District, that the proposed subdivision constitutes a danger to the safety and welfare of the inhabitants of the [t]own by proposing to add well over one hundred dwelling units to an area not serviced by [t]own water and with no adequate means available to reduce danger and secure safety in the case of fire or other disaster within the subdivision." This reason for disapproval is also invalid; no rule or regulation of the planning board purports to require a developer to demonstrate that an adequate supply of water for fighting fires will be available in or to a subdivision which will not be served by town water. See *Canter* v. *Planning Bd. of Westborough,* 4 Mass. App. Ct. at 308-309, and the cases there collected.[3]

---

[3] We are not to be understood as expressing any opinion on the question whether G. L. c. 41, §§ 81M and 81Q, could be construed to authorize a rule or regulation designed to accomplish the result desired by the planning board in this case.

Fairbairn *v.* Planning Board of Barnstable.

7. The planning board's sixth reason for disapproval was that it found that "the proposed entrance onto Route 6A constitutes a dangerous and hazardous intersection which would present a danger to life and limb in the operation of motor vehicles." The plaintiffs' attack on this reason is that it is not grounded on any provision of the planning board's rules and regulations. We have studied with some care the portions of the rules and regulations which might be thought to have some bearing on the problem of traffic safety at the intersection of a public way with any of the ways to be laid out in a proposed subdivision.[4] Although those rules and regulations are obviously directed to "reducing danger to life and limb in the operation of motor vehicles" (G. L. c. 41, § 81M), we find no statement or evidence of a "reasonably definite" (*Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield,* 344 Mass. at 334) intention on the part of the planning board to "[lessen] congestion ... in the adjacent public ways" or to "[coordinate] the ways in a subdivision ... with the public ways in the ... town" within the meaning of § 81M. Accordingly, we conclude that this aspect of the case also falls within the *Canter* case, 4 Mass. App. Ct. at 309-310, and that the sixth reason advanced by the board in support of its decision is invalid.

8. The judgment of the Superior Court will have to be affirmed (with one slight modification) because, as we have held, two of the reasons given by the planning board in support of its disapproval of the plaintiffs' definitive subdivision plan are valid. One of those reasons (the fourth) can be overcome by relatively simple physical amendments of the plan. The other reason (the first) was the adverse recommendation of the board of health, the validity of which has yet to be explored. The parties have briefed and argued a number of questions concerning the validity of that recommendation and the processes by

---

[4] Section V (2) ("STREET DESIGN STANDARDS"), (3) ("RIGHT OF WAY WIDTH. Street right of way widths"), and (4) ("STREET ALIGNMENT").

which it was formulated. It is obvious that the plaintiffs intend to continue pressing for some form of subdivision, and in the circumstances we think we should express our views on the problems which seem likely to arise in the future. *Harvard* v. *Maxant,* 360 Mass. 432, 437 (1971).

(a) We say first that we do not think that the validity of the board of health's recommendation was placed in litigation by the appeal taken by the plaintiffs under the provisions of G. L. c. 41, § 81BB. That section allows an appeal to the Superior Court by any person "aggrieved ... by any *decision* of a planning board concerning a plan of a subdivision" (emphasis supplied). Although the planning board was required to and did give the adverse recommendation of the board of health as a reason for disapproving the plaintiffs' plan, we have already seen that the planning board was powerless to decide, or review the decision of the board of health on, the sewage disposal problems which were within the exclusive cognizance of the latter board. We do not think the recommendation of the board of health is comprehended within or forms a part of the "decision" of a planning board within the meaning of § 81BB. Compare *Rounds* v. *Water & Sewer Commrs. of Wilmington,* 347 Mass. at 45.

This is not to say that a developer who claims to be aggrieved by an adverse recommendation of a board of health made under G. L. c. 41, § 81U, is powerless to seek any form of judicial review of that recommendation. We think the developer may, in conjunction with an appeal from the decision of the planning board under G. L. c. 41, § 81BB, maintain an action in the nature of certiorari against the board of health under G. L. c. 249, § 4 (as appearing in St. 1973, c. 1114, § 289). See and compare *Boston Edison Co.* v. *Selectmen of Concord,* 355 Mass. 79, 83-87 (1968); *Reading* v. *Attorney Gen.* 362 Mass. 266, 269-270 (1972); *Hershkoff* v. *Registrars of Voters of Worcester,* 366 Mass. 570, 574 (1974); *Stetson* v. *Selectmen of Carlisle,* 369 Mass. 755, 757, 758 (1976); *Assessors of Saugus* v. *Baumann,* 370 Mass. 36, 37 (1976). The scope of review by the Superior Court will not be the same as that

afforded under § 81BB (see part 1 of this opinion), but the developer will be permitted to test the sufficiency of the evidence adduced before the board of health to warrant the "specific findings" which that board is required to include in its report to the planning board under G. L. c. 41, § 81U, as well as the legal sufficiency of the "reasons" required to be stated in that report.[5] A corollary of this is that a board of health runs a serious risk of having its recommendation annulled by a court if the board fails to maintain a complete "record of the proceedings complained of" (G. L. c. 249, § 4), including a record of the evidence adduced before the board.[6]

(b) We have already seen that an adverse recommendation by a board of health can be just as devastating to a developer as the adverse decision of a planning board acting within its jurisdiction. The formulation by a board of health of the recommendation and report required by G. L. c. 41, § 81U, involves a process which is adjudicatory rather than legislative or political. See *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 499-500 (1965); Davis, Administrative Law Treatise, §§ 7.02, 7.03, 7.06 (1958). Contrast *Hayeck* v. *Metropolitan Dist. Commn.* 335 Mass. 372, 374-375 (1957); *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617 (1958); *First Church of Christ, Scientist* v. *Alcoholic Beverages Control Commn.* 349 Mass. 273, 274-275 (1965); *Reid* v. *Acting Commr. of the Dept. of Community Affairs,* 362 Mass. 136, 140, 142-143 (1972); *Cambridge Elec. Light Co.* v. *Depart-*

---

[5] We see nothing in the amendment of G. L. c. 249, § 4, which was effected by St. 1973, c. 1114, § 289, that was intended to destroy the right confirmed by St. 1943, c. 374, § 1, to "contend ... that the evidence which formed the basis of the action complained of or the basis of any specified finding or conclusion was as matter of law insufficient to warrant such action, finding or conclusion." Any other reading of the present § 4 would present serious problems. See *Southwick Birds & Animals, Inc.* v. *County Commrs. of Worcester,* 360 Mass. 133, 134, n.1 (1971).

[6] We express no opinion on the question whether a developer could also challenge the board of health's recommendation in proceedings brought under G. L. c. 231A. See *Reading* v. *Attorney Gen.* 362 Mass. at 271; *Stetson* v. *Selectmen of Carlisle,* 369 Mass. at 758.

*ment of Pub. Util.* 363 Mass. 474, 486-488 (1973); *DuBois* v. *Selectmen of Dartmouth,* 2 Mass. App. Ct. 674, 675-678 (1974). Without deciding whether one's right to develop his property under the Subdivision Control Law should be characterized as a property right or as a right to engage in a lawful occupation (see *Regents of State Colleges* v. *Roth,* 408 U. S. 564, 569-572 [1972]; *Goss* v. *Lopez,* 419 U. S. 565, 574 [1975]), we are of opinion that a board of health is constitutionally required to afford a developer a measure of procedural due process prior to formulating an adverse recommendation to a planning board. See *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. at 495, 499-500; *Boston Gas Co.* v. *Department of Pub. Utils.* 368 Mass. 51, 54-55 (1975).

In answer to the question "[W]hat process is due?" (*Lotto* v. *Commonwealth,* 369 Mass. 775, 779-780 [1976]), we think that upon the filing with the board of health of a copy of his definitive subdivision plan pursuant to G. L. c. 41, § 81U, a developer who desires a hearing before that board may also file a request therefor in writing. Compare *Marmer* v. *Board of Registration of Chiropractors,* 358 Mass. 13, 17 (1970). If, after studying the plan, the board is disposed to disapprove the plan or to approve it subject to conditions which have not been agreed to by the developer, the board must honor the developer's request for a hearing and give him reasonable notice of the time and place thereof. The developer must be advised of all the facts and other material in the possession of the board on which it intends to rely, and he must be given the opportunity to produce all relevant evidence, to cross examine witnesses, and to present argument. Rathkopf, Zoning and Planning, c. 43, § 3 (3d ed. 1972). Davis, Administrative Law Treatise, § 7.05 (1958). *Wadell* v. *Board of Zoning Appeals,* 136 Conn. 1, 8-10 (1949). *Hyson* v. *Montgomery County,* 242 Md. 55, 67 (1966).

The standard to be applied by the board of health in deciding whether to approve or disapprove a plan in whole or in part (or to require the imposition of conditions) is

that found in § 81U, namely, whether "the lots shown on such plan [can] be used for building sites without injury to the public health." We have already discussed the records which the board must keep of its proceedings. See also G. L. c. 39, §§ 23A-23C, as appearing in St. 1975, c. 303, § 3.

(c) One of the reasons given by the board of health for its adverse recommendation with respect to the entire plan was that the plaintiffs had failed to prove to the board's satisfaction that certain of the lots shown on the plan would meet one or more of the requirements of art. XI of the State Sanitary Code ("Minimum Requirements for the Disposal of Sanitary Sewage in Unsewered Areas") promulgated under G. L. c. 111, § 127A.[7] Section 127A requires each local board of health to enforce the provisions of the code (*Van Scoyoc* v. *Board of Health of Sherborn,* 4 Mass. App. Ct. 97, 101 [1976]), the primary purpose of which "is to prevent violations rather than to punish past violations as criminal offences." *Commonwealth* v. *Haddad,* 364 Mass. 795, 799 (1974). But a local board of health is also required to act in a reasonable manner in formulating its recommendation and report under G. L. c. 41, § 81U. *United Reis Homes, Inc.* v. *Planning Bd. of Natick,* 359 Mass. at 623.

A review of the provisions of the code[8] discloses that in an unsewered residential development of the type contemplated in the present case the minimum required size and

---

[7] Section IV, (4), (C), of the rules and regulations of the planning board purports to require that a definitive subdivision plan be accompanied by a certificate of "approval by the [b]oard of [h]ealth of the means of sewage disposal proposed, and approval of the soil structure in the disposal locus" "[i]f [d]istrict sewerage is not proposed." In view of what has already been said in part 3 of this opinion, we would find it difficult to conclude that a planning board has the power to require a board of health to consider any particular health factor in formulating its recommendation and report under G. L. c. 41, § 81U.

[8] The version of the code which was introduced in evidence in the Superior Court and which is before us embodies all amendments adopted through April 12, 1966. We have not been advised of any possible subsequent amendments.

capacity of the septic tank and leaching field of each individual sewage disposal unit will depend, in part at least, on the number of bedrooms in each particular dwelling (§§ 2.11, 5.1, 7.1). Where the septic tank and leaching field may be located will depend in large measure on certain minimum required distances which must be maintained from the dwelling, the lot lines, water supply lines, wells and water courses (§ 3.2). The required determination of the maximum ground water elevation (§§ 7.2, 14.3) and the required percolation test (§ 14.1) cannot be made until the location of the proposed leaching area is determined. In short, there is no way of telling whether any given lot will meet the requirements of the code until it is known where the owner of the lot proposes to locate his dwelling and how many bedrooms he proposes to have.

No provision of the Subdivision Control Law requires the subdivider to construct any dwelling in any part of the subdivision, and it is common knowledge that lots are often sold out of subdivisions to individual buyers who wish to construct homes which will suit their particular architectural tastes and family needs. When a subdivider submits a definitive subdivision plan to a planning board and a board of health he will seldom be in a position to prove that the requirements of the code will be met with respect to what may ultimately be constructed on each individual lot in his subdivision, even if he expects to do all the construction. But that fact does not leave the public or any individual purchaser of a lot at the mercy of the subdivider. The code is explicit on the points (1) that no building or plumbing permit may be issued for any dwelling on any lot until a permit has been obtained from the board of health for the location and construction of an individual sewage disposal unit (§§ 2.1, 2.2, 2.5), (2) that the board of health may not issue any such permit until it has been supplied with all the information necessary to determine whether all the relevant requirements of the code will be met (§ 2.3), and (3) that no new dwelling may be sold or occupied until the board of health has is-

sued a certificate to the effect that the requirements of the code have been met (§ 2.6).[9]

We think that at the § 81U stage of a case like the present the board of health would be acting prematurely (compare *MacGibbon* v. *Board of Appeals of Duxbury,* 369 Mass. 512, 516 [1976]) and unreasonably if it were to take any action with respect to art. XI of the code other than requiring the planning board to endorse a condition on the definitive plan to the effect that no dwelling shall be built on any lot without first securing from the board of health the disposal works construction permit required by the code. Compare *Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield,* 344 Mass. at 330, 331.

The judgment is to be modified by striking out the second paragraph thereof and, as so modified, is affirmed, without costs.

*So ordered.*

---

[9] Section 20.1 of art. XI provides in part: "The board of health may vary the application of any provision of this article with respect to any particular case when, in its opinion, the enforcement thereof would do manifest injustice; *provided,* that the decision of the board of health shall not conflict with the spirit of these minimum standards."