DONALD A. MORSE *vs.* BOARD OF SELECTMEN OF ASHLAND & others.[1]

Middlesex.   April 18, 1979. — June 13, 1979.

Present: KEVILLE, GOODMAN, & GREANEY, JJ.

*Practice, Civil,* Extraordinary review. *Municipal Corporations,* Officers and employees. *Public Board. Words,* "Substantial evidence."

In an action in the nature of certiorari to review proceedings of a board of selectmen for dismissal of the fire chief in a town which had accepted G. L. c. 48, § 42, the question whether the conclusions reached by the board were supported by substantial evidence was open to consideration, and this court, after reviewing a transcript of the selectmen's proceedings, held that the evidence was insufficient to support a conclusion that the chief was "incompetent, inefficient and unworthy to continue in [his] position." [743-750]

A conclusion by the board of selectmen of a town which had accepted G. L. c. 48, § 42, that the fire chief of the town was "insubordinate" was unsupported by substantial evidence where the record of testimony at the hearing culminating in the chief's dismissal contained, in support of the selectmen's charge of insubordination,

---

[1] Two selectmen, Edwin C. Gilman and William C. Daisley, III, were named as individual defendants as well as in their representative capacities.

only a single question relative to the chief's absence from a previous hearing to which he had been summoned, and the chief's declining to answer on the advice of counsel. [750]

CIVIL ACTION commenced in the Superior Court on May 17, 1977.

The case was heard by *Meyer*, J., a District Court judge sitting under statutory authority.

*Jerry J. DiGeronimo*, Special Counsel for the town of Ashland (*Algernon Heine*, Town Counsel of Ashland, with him) for the defendants.

*C. A. Peairs* for the plaintiff.

GREANEY, J. By this appeal the plaintiff, the former fire chief (chief) of the town of Ashland challenges the validity of his dismissal from that position by his appointing authority, the Ashland board of selectmen (board).[2] We are specifically concerned with the questions whether the dismissal is flawed by an error of law (as found by the judge) and whether it is supported by substantial evidence.

We summarize the procedural history of the case and the background facts necessary to an understanding of the issues, reserving elaboration on the evidence before the board for the body of this opinion. On March 3, 1977, the chief received a letter from the board notifying him of some twenty charges lodged against him, and stating the board's intention to conduct a hearing to determine whether disciplinary action or removal would be appropriate. The chief requested specifications of the charges, which the board denied. The board convened to hold a hearing on April 6, 1977, at which neither the chief nor his counsel was present and at which no evidence was taken. By letter dated April 7, 1977, the chief was informed that, because he had failed to appear at the sched-

---

[2] General Laws c. 48, § 42, as amended by St. 1973, c. 1048, § 1, provides that towns accepting its provisions may establish a fire department to be under the control of a chief who shall be appointed by the selectmen. The chief "may be removed for cause by the selectmen at any time after a hearing."

uled meeting, the board had found an "admission by default" of the charges and thus sufficient cause for his removal. The chief promptly challenged his removal on the basis voted by the board. Unsuccessful in an application for preliminary injunctive relief in the trial court, he applied for interlocutory relief under G. L. c. 231, § 118, as appearing in St. 1973, c. 1114, § 202, to a single justice of this court, who ordered (the parties having agreed) that the original proceedings be vacated, and that a new hearing be held encompassing the original charges and an added charge of "insubordination" (if the board wished to pursue it) arising out of the chief's failure to attend the hearing scheduled on April 6, 1977.

The board accepted the invitation to add the insubordination charge to its list of grievances against the chief. New proceedings then took place over several days; four of the charges were dismissed and the board reserved judgment on the balance. On April 30, 1977, the board notified the chief in a letter signed by two of its three members that he was "discharged forthwith."[3] The chief again promptly renewed his complaint contesting his removal. All the parties agreed to treat the action as one in the nature of certiorari under the provisions of G. L. c. 249, § 4, as appearing in St. 1973, c. 1114, § 289 (see note 5, *infra*), and pursuant to that agreement, a formal return of the entire proceedings before the board was filed

[3] The letter provided in pertinent part that "it is the decision of a majority of the Board that you are discharged forthwith as the Fire Chief of the Town of Ashland. You are further advised that this action is predicated upon the causes that: (1) You are incompetent, inefficient and unworthy to continue in the position of Fire Chief for the Town of Ashland. (2) That you have been insubordinate in your failure to appear, upon subpoena, before the Board of Selectmen, Town of Ashland at a hearing on April 6, 1977 to answer to charges relating to disciplinary matters under the provisions of Chapter 48, Section 42. You are advised that the said Board finds sufficient reasons based upon the evidence in the testimony produced at the hearings on the aforesaid charges to establish such causes and you are hereby notified of the aforesaid action."

in the Superior Court. After review of the record, a District Court judge sitting under statutory authority ruled that the board's action was vitiated by an error of law in that the board had failed to comply with the single justice's directives which returned the matter to it for a fresh start. Based solely on this ruling, and without consideration of whether the record disclosed substantial evidence to support the discharge, the judge ordered the proceedings quashed and the chief reinstated with back pay and benefits. We conclude that the judge's ruling that the record disclosed an error of law was wrong for the reasons noted in the margin.[4] Moreover, since we have before us the transcript of the proceedings before the board (including the exhibits), we determine it appropriate to reach, discuss, and determine whether the board's conclusions that the chief was "incompetent, inefficient and unworthy to continue in [his] position ... [and] insubordinate in [his] failure to appear ... before the board ... on April 6, 1977" are supported by substantial evidence.[5] We conclude that they are not. Our first task is to

---

[4] The single justice's order entered on April 14, 1977, stayed the April 7, 1977, decision of the board removing the chief and noted that the parties had agreed to conduct a new hearing which would supersede the hearing held on April 6, 1977, and the decision which resulted from it. It specifically provided that the new hearing would concern itself with "the charges dated March 3, 1977, plus an additional charge [insubordination] as set out in the [decision] dated April 7, 1977." The judge ruled that the board's letter listing an additional charge of insubordination "violated both their own agreement with the plaintiff and the ... order of [the single justice.]" He thus took the position that the board was barred by the single justice from raising the insubordination allegation at the new hearing, and that by using it as a basis for the dismissal they had committed an "error of law." However, the order of the single justice expressly contemplated that the board might take up the question of the chief's failure to attend the April 6, 1977, hearing as possible cause for his discharge.

[5] On review in the nature of certiorari the question whether the conclusions reached by the board are supported by substantial evidence is open for consideration. As we said in *Fairbairn* v. *Planning Bd. of Barnstable*, 5 Mass. App. Ct. 171, 181 n.5 (1977), overruled on other grounds by *Loring Hills Developers Trust* v. *Planning Bd. of*

outline in detail the evidence produced in support of each of the particular charges before applying the appropriate legal standards to measure the validity of the conclusions reached on that evidence.

### The Evidence[6]

A. *Medical reports.* Two charges asserted that the chief had failed to require and obtain medical reports prior to the return to duty of four named firefighters, who had claimed injury or disability, and that in one case the failure was "deliberate and willful." There was testimony

*Salem*, 374 Mass. 343, 349-350 (1978): "We see nothing in the amendment of G. L. c. 249, § 4, which was effected by St. 1973, c. 1114, § 289, that was intended to destroy the right confirmed by St. 1943, c. 374, § 1, to 'contend ... that the evidence which formed the basis of the action complained of or the basis of any specified finding or conclusion was as matter of law insufficient to warrant such action, finding or conclusion.' Any other reading of the present § 4 would present serious problems. See *Southwick Birds & Animals, Inc.* v. *County Commrs. of Worcester*, 360 Mass. 133, 134 n.1 (1971)." Although the judge in the Superior Court did not review the record from this perspective, since no findings of fact are involved, our review in a case of this type would in any event require an examination of the entire record to ascertain the presence or absence of substantial evidence to support the conclusions of the board.

[6] The evidence is cast against a background of the duties imposed on a fire chief by G. L. c. 48, § 42, as amended by St. 1973, c. 1048, § 1, as follows: "He shall have charge of extinguishing fires in the town and the protection of life and property in case of fire. He shall purchase subject to the approval of the selectmen and keep in repair all property and apparatus used for and by the fire department. He shall have and exercise all the powers and discharge all the duties conferred or imposed by statute upon engineers in towns except as herein provided, and shall appoint a deputy chief and such officers and firemen as he may think necessary, and may remove the same at any time for cause and after a hearing. He shall have full and absolute authority in the administration of the department, shall make all rules and regulations for its operation, shall report to the selectmen from time to time as they may require, and shall annually report to the town the condition of the department with his recommendations thereon; he shall fix the compensation of the permanent and call members of the fire department subject to the approval of the selectmen. In the expenditure of money the chief shall be subject to such further limitations as the town may from time to time prescribe."

that when an Ashland firefighter was injured at a fire, whoever was in charge at the scene prepared a report which was placed in the injured person's file. In addition, whenever a firefighter returned from a lengthy medical absence, the chief requested a statement from a doctor that the firefighter was fit to work. The chief testified that he had requested reports from all four named fire-fighters, that he had received two reports (which he had with him at the hearing), that another firefighter had informed him that his report had been sent directly to the selectmen, and, with regard to the charge of "willful failure" to file a medical report for a firefighter, that he had written four letters to that firefighter requesting the forms. A former selectman testified that from 1958 through 1976 it was the board which in fact requested medical reports but "[i]t was the [c]hief's prerogative." There was no contrary evidence presented on the medical reports issue.

B. *Competency and training.* Two charges asserted that the chief failed to test the competency of new firefighters or to provide training for firefighters, in-house or otherwise. Both firefighters and a former selectman testified that the department gave in-house training in the use of the apparatus once a month, and the former selectman testified that there was discussion during collective bargaining sessions about attendance by firefighters at institutions in the Commonwealth to upgrade their training, but that the recommendation was abandoned because firefighters were not paid tuition or their hourly rate for such attendance. There was no testimony to the contrary. As to competency testing of new firefighters, all the testimony indicated that the last person hired for a regular position, approximately three years before the hearing, had previously been a call firefighter,[7] and the chief was satisfied that this individual was qualified. There was no

[7] Call firefighters respond to fires from their homes or places of employment.

testimony concerning firefighters hired before this in-
dividual, and it was uncontroverted that there were no
openings in the fire department for new appointments at
the time of the hearing. There was no contrary evidence
introduced on these charges.

C. *Policy and regulations.* Two charges asserted that
the chief failed to provide a policy for response to alarms
and for the operation of the fire department in his ab-
sence and the absence of other supervisory personnel. All
the firefighters who testified stated that they respond to
all audible alarms between 6:00 A.M. and 6:00 P.M. and to
second alarms between 6:00 P.M. and 6:00 A.M. during
off-duty periods. One person testified that call firefight-
ers also respond to audible alarms twenty-four hours a
day and that most firefighters have "plectrons" (home
signalling devices). Some firefighters testified that these
rules were written and had been posted for at least thir-
teen years. A former selectman testified that during the
period of his service on the board suggestions had been
made to the chief regarding policies of the type in issue,
which the chief had implemented. There was no contrary
evidence on these charges.

The policy regarding a chain of command in the chief's
absence was similarly understood and testified to by the
firefighters: in the absence of the chief, the captain (the
person next in command) made all necessary decisions,
and if both the chief and the captain were absent the
"desk man" was the person in charge. On one occasion,
in 1972, the captain and the chief were simultaneously on
vacation for a period of about four days. There was no
testimony as to anything which occurred during that pe-
riod. The chief also testified that the driver of the first
piece of apparatus dispatched to a fire would be in charge
at the scene.

The lack of a deputy chief in the department was also
raised. There was testimony that at a meeting with the
selectmen some fourteen years previously, agreement
had been reached to appoint a captain in lieu of a deputy

chief. A former selectman testified that the selectmen appointed a deputy chief for a brief period in 1972 without pay, but the arrangement was unsatisfactory and "was dropped." The former selectman testified that he had seen written rules and regulations as to these policies concerning the fire department. There was no contrary evidence as to lack of rules and regulations or a policy for running the department in the chief's absence.

D. *Maintenance of equipment and the station.* In two charges the board asserted that the chief had failed to provide a program for acquisition of firefighting equipment, that there was a complete absence of a maintenance program to keep the existing equipment in repair, and that there was a similar lack of a program to maintain the fire station. It was uncontroverted that the chief had requested new firefighting equipment several times, and that on one occasion the board had failed to include the request in the town meeting warrant and that other requests had been defeated at the town meeting; that a new ambulance and a hydraulic tool utilized to rescue victims trapped in motor vehicles (the "Jaws of Life") had been purchased by raising money independently of the town meeting; that the chief had requested, and had been denied, the right to hire a fire department mechanic; that only minor repairs to the equipment could be accomplished at the fire station, but that the board of public works satisfactorily made any major repairs required; that a weekly work list for station maintenance was posted in the fire station and a maintenance log kept for checking equipment; that the fire station was better maintained than the police station, and that the major repairs to the station itself fell within the responsibilities of the municipal improvements committee. The selectmen produced no countervailing evidence.

E. *Sick time, vacation and fill-in time.* Six charges asserted that the chief was grossly incompetent in administering the town's liability for sick time, vacation, bereavement, and fill-in time. Specifically, it was claimed that his

reports were inaccurate, that he had misapplied budgeted money by using sick time for fill-in time; that there were eight discrepancies from December, 1975, to July, 1976, of paid overtime fill-in for vacation and sick time; that firefighters were illegally permitted to accrue ninety days' sick time instead of the alloted sixty-five days; that the 1977 log had been falsified and tampered with; and that the payroll warrants did not correlate with the supplementary payrolls designating fill-in time. The captain, who was responsible for keeping the sick log, testified that changes noted in the log not in his handwriting were to correct the headings of some items, and that the log was not falsified; that someone had brought to the chief's attention an error in the columns which was then corrected; and that the log was an accurate record and did not reflect any misuse of sick leave.

The captain and the chief testified as to the types of salary accounts that were maintained for the firefighters. There was no specific testimony by any witness concerning misapplication of budgeted money, falsification of the sick log, or individual discrepancies between the department's records and the payroll warrants. There was testimony that the selectmen regularly signed the payroll. All firefighters who testified knew that they were entitled to the accrual of only sixty-five days of sick leave, and not ninety days. The chief did testify that on one occasion there was a mathematical error as to sick leave brought to his attention, which the captain corrected and which the chief had subsequently brought to the attention of "one or two selectmen." Despite considerable questioning of the chief concerning the town's liability policy for firefighters, the evidence indicated that the terms of the policy were established in collective bargaining sessions in which the chief did not participate. There was testimony from the town treasurer that the selectmen annually approved the checks for the policy premiums, and the chief testified that the firefighters sent forms directly to the insurance carrier, and the carrier did not supply him

with records of anyone's insurance status. If in fact the town expected the chief to administer the liability policies, there was no evidence presented that anyone had ever explained to the chief his responsibilities concerning the policy.

F. *Collective bargaining contract.* Another charge asserted the chief's gross incompetence in interpreting and administering the collective bargaining contract by giving bonuses to individuals of funds belonging to the town, and by his policies regarding overtime pay. The testimony indicated that the chief did not participate in the negotiations that led to the contract nor did he sign the agreement. The town did not provide him with a copy of the agreement, and town counsel never explained its provisions to him. There was no evidence of the payment of any bonuses by the chief nor any indication that the overtime policy established by the chief was in any way inconsistent with, or deviated from, the terms of the agreement.

G. *Compensation for call firefighters.* One charge accused the chief of setting compensation for call firefighters without the approval of the selectmen. However, the uncontroverted testimony of the chief, a former selectman, and a call firefighter was that the chief and the board negotiated the compensation together and that the final amount was placed on a warrant which the selectmen "evidently" signed.

H. *Insubordination.* The final charge stated that the chief was insubordinate because of his failure to appear at the initial public hearing scheduled on April 6, 1977, without expression of a reason that justified his absence. The sole evidence on this point came from the chief, who was asked one question as to why he did not attend the meeting. He declined to answer the question on advice of his counsel. The board pressed the point no further and made no order requiring an answer. The text of the single justice's order returning the matter to the board with an indication that it could pursue the insubordination question was placed in evidence.

## The Sufficiency of the Evidence

The conclusions of the board that the chief was "incompetent, inefficient and unworthy to continue in [his] position . . . [and] insubordinate" in order to be sustained on review must be supported by substantial evidence on the record considered as a whole. Substantial evidence in this context has been defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), as amended through St. 1975, c. 817, §§ 1, 2. *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968) (applying this standard to actions in the nature of certiorari under G. L. c. 249, § 4). *Fairbairn* v. *Planning Bd. of Barnstable*, 5 Mass. App. Ct. 171, 181 n.5 (1977), overruled on other grounds by *Loring Hills Developers Trust* v. *Planning Bd. of Salem*, 374 Mass. 343, 349-350 (1978). Accord *Boston Edison Co.* v. *Boston Redevelopment Authy.*, 374 Mass. 37, 48 (1977). We are satisfied that the evidence in this case does not meet that test.

We note first that many of the assertions made in the various charges fail to refer to any specific dates or any specific time frames. Conceivably, they concern the entire fourteen-year period of the chief's employment by the town, an observation which casts an immediate shadow over the record. More troubling, and fatal to the selectmen's conclusions, is the lack of affirmative evidence in the record to support any of the charges. The evidence when viewed in an unbiased, reasonable and common sense fashion, and with deference to the board's role as the judge of credibility, tilts sharply in favor of the chief's position on the issues. As the evidence on the various charges is sorted out it becomes clear that the chief had complied with the responsibilities assigned to him, that the selectmen had been consulted and had given their approval to many of the disputed items, that many of the job responsibilities claimed to have been breached had never been clearly assigned to the chief, and that whatever peccadilloes may have been committed were more

venial than mortal. With particular reference to the insubordination charge, the chief, of course, was the one in the best position to explain his failure to attend the first scheduled hearing in response to the board's summons. If his explanation was inadequate, a sufficient basis might exist for disciplinary action. But to support a discharge, something must exist in the record to warrant the conclusion that he was insubordinate. A single question was asked by the board and went unanswered by the chief on advice of his counsel. The board did not order the chief (as it could have) to explain his failure to attend the first meeting. With the matter thus left unexplained, we are not prepared to say, without something more in the record, that this scant exchange entitled the board to draw an inference of insubordination on his part.

While the board was not "bound to give credit to testimony even though uncontradicted," it is equally settled that "[m]ere disbelief of testimony is not proof of facts of an opposite nature or tendency," *McDonough* v. *Vozzela*, 247 Mass. 552, 558 (1924), and that "such disbelief [of testimony] would not be equivalent of proof to the contrary." *Carmichael* v. *Carmichael*, 324 Mass. 118, 121 (1949). *Wakefield* v. *American Sur. Co.*, 209 Mass. 173, 177 (1911). We are of the opinion, after a careful review of the record, that the conclusions reached by the board either were essentially based on the selectmen's disbelief of much of the testimony, or may have been arrived at by consideration of information learned outside of the hearing. In either event the dismissal was not based on adequate cause established by the evidence. Overall, we come away from our review of the record with the impression that the chief had substantially complied with his responsibilities as set forth in G. L. c. 48, § 42, and with such other responsibilities as were assigned to him from time to time by the board.

The judgment is vacated and the matter is remanded to the Superior Court where a new judgment is to be entered voiding the dismissal, reinstating the chief to his

former position, and awarding him (after appropriate hearings if necessary) back pay and job-related benefits from the date of his dismissal to the date of his reinstatement.

*So ordered.*