ADVANCED DEVELOPMENT CONCEPTS, INC. *vs.* TOWN OF
BLACKSTONE.

No. 91-P-353.

Suffolk. March 19, 1992. - August 26, 1992.

Present: FINE, GILLERMAN, & LAURENCE, JJ.

*Municipal Corporations*, By-laws and ordinances. *Zoning*, By-law, Build-
ing permit, Special permit. *Subdivision Control*, Limitation on rate of
development. *Words*, "Unused authorizations."

In an action by a developer arising from a town's denial of the plaintiff's
application for a "rapid development" special permit under the town's
zoning by-law, the judge correctly rejected the plaintiff's proffered in-
terpretation of the "rate of development" provisions of the by-law and
agreed with the town's interpretation that, under language forbidding
the building inspector to issue, to any one developer or for any single
parcel of property during any twelve-month period, building permits
authorizing more than ten dwelling units, "exclusive of unused authori-
zations which have lapsed or have been withdrawn," the plaintiff was
not entitled to an accumulating total of building permits for ten dwell-
ing units in each year that had elapsed since its subdivision plan was
approved in 1986, but only to those permits actually applied for and
received, up to the allowed maximum of ten dwelling units per year, in
the absence of a rapid development special permit authorizing more.
[231-234]

CIVIL ACTION commenced in the Land Court Department
on November 14, 1988.

The case was heard by *John E. Fenton, Jr.*, J., on a mo-
tion for summary judgment.

*Henry J. Lane* for the plaintiff.

*Stanley L. Weinberg* for the defendant.

LAURENCE, J. Section 123-14 of Blackstone's zoning code
(the "rate of development" by-law) forbids the building in-
spector to issue, to any one developer or for any single parcel
of property during any twelve-month period, building permits
authorizing more than ten dwelling units, "exclusive of un-

used authorizations which have lapsed or have been withdrawn." The planning board may, however, authorize a greater number of units in a given year by granting a "rapid development" special permit upon the developer's satisfaction of certain criteria. At issue is the meaning of the words "unused authorizations" in § 123-14.[1]

Advanced Development Concepts, Inc. (ADC), obtained planning board approval in July, 1986, of a definitive subdivision plan showing forty-seven residential units. The plan approval was made subject to a number of conditions to be satisfied prior to the building of any dwellings, including the widening and improvement of certain roads and the construction of a larger drainage system and detention basin and on-site sewage disposal systems. ADC did not challenge (see G. L. c. 41, § 81BB) or formally seek to modify (see G. L. c. 41, §§ 81R & 81W) the conditions of approval. Instead, in October, 1986, it sought a rapid development special permit under § 123-14 for the construction of all forty-seven units within a twelve-month period. The planning board denied its application in February, 1987, for the reason that such a development would have numerous adverse impacts on the neighborhood and the town.

---

[1]Section 123-14, adopted by the town in 1980 and originally denominated Section 2700, reads in its entirety:

"The Building Inspector shall not issue building permits authorizing more than ten (10) dwelling units (exclusive of unused authorizations which have lapsed or have been withdrawn) during any twelve-month period within property which, as of July 1, 1979, was contiguous and in the same ownership [or in different ownerships each involving one (1) or more of the same principals] or to any one applicant [or set of applicants involving one (1) or more of the same principals] unless the Planning Board has granted a special permit for rapid development. Such special permit shall be granted only upon Planning Board determination that in addition to the special permit criteria of § 123-4C, such development also would serve a salient housing need, would be infeasible if limited to ten (10) units over twelve (12) months and would not overburden public services."

The zoning code does not define "authorizations," "unused authorizations" or the phrase "unused authorizations which have lapsed or have been withdrawn."

ADC challenged the denial on the grounds that § 123-14 was facially unconstitutional and as applied effected a taking of its property. In September, 1988, a Superior Court judge upheld both the constitutionality of § 123-14 and the propriety of the planning board's action thereunder.[2]

ADC immediately commenced this action in the Land Court, pursuant to G. L. c. 240, § 14A. It sought a declaration that the proper construction of the "unused authorizations" provision of § 123-14 entitled it to the full accumulated quota of building permits for each year that has elapsed since its subdivision plan was approved in 1986, even though it had not in fact applied for any permits in any year. ADC wanted the words "unused authorizations" to be construed to mean those building permits that it could theoretically have applied for and received in a given year, not those that it actually applied for, received, and then did not use. Such a construction would mean that by 1990 ADC would have amassed sufficient building permit entitlements to allow it to construct dwelling units on all of its subdivided lots.

The underlying reason for ADC's position was revealed in an undated affidavit filed with the Land Court by ADC's vice president, Marc A. Coté. Coté stated that ADC had not applied for the allowed ten permits per year during the period 1986-1990 because "a building permit will not issue until the roadway, drainage and other parts of the subdivision infrastructure are completed and the cost of installing that infrastructure is prohibitive for ten units." No specific evidentiary support, however, was presented for the conclusory assertion regarding the purported prohibitiveness of compliance with the building permit conditions.

On ADC's motion for summary judgment, the Land Court judge rejected ADC's proffered construction and agreed with the town's position. The town contended that the term "un-

---

[2]In his findings of fact, the Superior Court judge noted that ADC "was aware of the limitations imposed on developers by Sec. [123-14] . . . prior to the time it purchased the . . . property" which was the subject of its subdivision plan. Both parties have stated that ADC appealed the September, 1988, judgment, but no such appeal appears in this court's records.

used authorizations" in § 123-14 meant those building permits that had actually been applied for and issued but were then subsequently not used, or were withdrawn, by the applicant. Under this construction, ADC was not entitled to an accumulating total of building permits for ten dwelling units per year since 1986, but only to those actually applied for up to the allowed maximum of ten per year, in the absence of a rapid development special permit authorizing more. The judge denied ADC's motion and granted summary judgment for the town.

We affirm the judgment of the Land Court on the basis of the judge's reasoning, with which we fully concur. The judge's interpretation of the words "unused authorizations which have lapsed or have been withdrawn" was correct for several reasons, not the least of which was the judge's proper deference to the reasonable construction that the relevant administrative body had given a regulation it was charged with implementing. See *Zoning Bd. of Appeals of Greenfield* v. *Housing Appeals Comm.*, 15 Mass. App. Ct. 553, 560-561 (1983).

By looking to the common and approved usage of the words at issue, including dictionary definitions, the judge's approach was consistent with ordinary principles of statutory construction. See *Commonwealth* v. *S.S. Kresge, Co.*, 267 Mass. 145, 148 (1929); *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977); *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283, 290-291 (1981); *McMann* v. *State Ethics Commn.*, 32 Mass. App. Ct. 421, 425 (1992). His limitation of the scope of "unused authorizations" to building permits actually applied for and issued but then not used or withdrawn by the applicant was in accord with approved dictionary definitions and common usage.[3]

---

[3]See Webster's Third New Intl. Dictionary 146-147 (1971). ADC contends that "authorizations" should include lots depicted within an approved subdivision. It is unclear whether this point was raised below; but in any event it is unsupported by any cited authority or reasoned argument (or by the sense and grammar of § 123-14, which contains no reference, express or implied, to subdivision regulations). It does not, therefore, con-

The judge's interpretation of the words "unused authorizations" as necessarily encompassing only past transactions is further supported by a contextual reading of the entire sentence. See *Commonwealth* v. *Barber*, 143 Mass. 560, 562 (1887). He accurately observed that "[i]t is hard to see how a building permit which has not yet been applied for can lapse or be withdrawn." ADC protests that the verbs used are inapt for building permits, which do not "lapse" but "expire" and do not get "withdrawn" but are "abandoned." See 780 Code Mass. Regs. § 114.3 (1980). This argument is unpersuasive. A cursory examination of any accepted dictionary reveals that "lapse" and "expire," on the one hand, and "abandon" and "withdraw" on the other, have significantly overlapping, if not synonymous, meanings and connotations.[4] Even if this were not so, courts are not foreclosed by faulty or imprecise draftsmanship from giving statutes and ordinances a practical and reasonable construction, as the judge did here. See *McIntyre* v. *Selectmen of Ashby*, 31 Mass. App. Ct. 735, 739-740 (1992).

The judge's construction avoids the unacceptable result that is the necessary consequence of ADC's position: to nullify the special permit provision of § 123-14. If a property owner need merely sit by and automatically accumulate permits for ten dwelling units per year, as ADC maintains,[5]

---

stitute acceptable appellate argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958). We have nonetheless reviewed this contention and conclude that it is without merit. See *Beaton* v. *Land Ct.*, 367 Mass. 385, 389-390 (1975); *Foley* v. *Evans*, 30 Mass. App. Ct. 509, 513 n.5 (1991).

[4]See Webster's Third New Intl. Dictionary 358 (1971) (cease), 748 (end), 801 (expire), 1272 (lapse), and 2359 (terminate); and 2 (abandon) and 2626 (withdraw).

[5]ADC does not in fact establish anywhere in the record that it would have been entitled to *any* building permits even had it applied for the maximum allotment each year from 1986 on. It is axiomatic that a building permit cannot issue unless the applicant has demonstrated compliance with, or at least nonviolation of, the requirements of the zoning code and all other applicable laws and regulations. See *Doliner* v. *Planning Bd. of Millis*, 343 Mass. 1, 6 (1961); 780 Code Mass. Regs. § 114.1 (1980). ADC concedes that it could not have obtained any permits until it had complied with the conditions of its subdivision approval, as required by

there would be no need or occasion to obtain that special permit or to comply with the specified conditions it requires. We cannot approve interpretation that renders a significant portion of any regulation superfluous. See *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.*, 352 Mass. 617, 618 (1967). ADC's construction would not merely result in unacceptable surplusage but would allow it to frustrate municipal policy by circumventing the very requirements it has already sought but failed to satisfy or overcome. General policy considerations underlying both zoning and subdivision regulation, on the other hand, support the judge's interpretation, see St. 1975, c. 808, § 2A; G. L. c. 41, § 81M, which is completely consistent with the legitimate purpose of the rate of development by-law: to prevent undue strain on public services and town finances by imposing reasonable controls for orderly growth. See *Sturges* v. *Chilmark*, 380 Mass. 246, 252-253 (1980).

While conceding the validity of this purpose, ADC nonetheless contends that the impact on public services and finances would be no different whether ten units are built each year or fifty units are built at the end of five years. This proposition is not merely implausible on its face (as well as unsupported by any facts in the record) but is directly belied by the town's denial of the special permit by which ADC sought to do precisely that. ADC's proposal was rejected on the very grounds, among others, that such rapid development would have unduly adverse effects on the neighborhood and the town with respect to traffic flow and safety, public utilities, town services, demographics, the environment, and fiscal balance. ADC's claim that the judge's interpretation violates the purpose of the zoning statute by allowing the prohibition, not just the control, of growth is equally devoid of factual support and is undercut by the existence of the presumptively

---

G. L. c. 41, § 81Y, but protests that it could not so comply except at "prohibitive" cost. In any other context, ADC would lack standing to assert such moot and hypothetical claims. Even in the absence of any actual controversy, however, as a landowner it may maintain an action under G. L. c. 240, § 14A. See *Woods* v. *Newton*, 349 Mass. 373, 376-377 (1965); *Sturges* v. *Chilmark*, 380 Mass. 246, 249-251 (1980).

valid and rational special permit procedure contained in §
123-14.

It is evident that the core of ADC's plaint is the unap-
pealed but (in its view) onerously conditioned subdivision ap-
proval. We are not unsympathetic regarding the practical
burdens posed for developers by such requirements. There is
much merit to ADC's point that requiring the construction of
a forty-seven lot subdivision to be spread over five years,
rather than permitting its completion in one, compels an in-
evitably less efficient and more costly allocation of resources.
Nonetheless, there are procedures and techniques for directly
addressing that problem — including a legal challenge to the
imposition of the conditions, see G. L. c. 41, § 81BB; com-
pare *Fairbairn* v. *Planning Bd. of Barnstable*, 5 Mass. App.
Ct. 171, 174-176 (1977); and negotiating with the authorities
for a more manageable phased or sequential development of
the required infrastructure, see G. L. c. 41, §§ 81R & 81W
— none of which ADC appears to have elected. Procrustean
distortion of the meaning of the rate of development by-law
is not, however, a valid method of redressing such a
grievance.

*Judgment affirmed.*