Fecteau, J.
These cases are related subdivision appeals brought pursuant to G.L.c. 41, §81BB of the Subdivision Control Law (G.L.c. 41, §8IK et seq.). Each of the appeals was timely filed from an April 24, 2000 decision of the Boylston Planning Board (“Board”) which approved a 43-lot[1] residential subdivision plan of properly entitled “Barnard Hill.” Youssef *437 B. Chehade, M.D. (“Chehade”), owner and subdivision applicant, as he is a plaintiff in Civil Action No. 00-1607, is appealing from the inclusion of certain conditions contained in the Board’s decision. Chehade’s appeal, as initially filed, contests the Board’s authority to impose four of the 24 conditions contained in the Board’s decision. At trial, Chehade waived his appeal as to all conditions except Conditions 22 and 23 which are discussed below. The four remaining appeals were filed by abutters, residents of the Town of Shrewsbuiy, who allege that the Board exceeded its authority in approving the plan. The Shrewsbuiy plaintiffs, who have named both Chehade and the Boylston Board of Health as defendants in addition to the Boylston Planning Board, contend that both the Board of Health and Planning Board exceeded their authority in failing to disapprove the plan. Each of the Shrewsbuiy plaintiffs’ appeals rest on two primary grounds: that the development will generate dangerous traffic conditions and that the plan proposes an improper clustering of septic systems for which a denial was warranted for public health reasons.
Three of the five actions were initially filed in the Land Court but were transferred to the Worcester Superior Court by an order of interdepartmental transfer pursuant to G.L.c. 21 IB, §9. The consolidated cases were tried on October 2-4, 2002, before me, sitting without juiy. The admissibility of 27 Exhibits was agreed upon and additional exhibits were admitted during trial. The parties were granted leave until October 25, 2002, by which requests for findings of fact and rulings of law were to be filed. Upon consideration of the evidence and the arguments of the parties, the following findings of fact and rulings of law are made.
FINDINGS OF FACT
A. Background
1. Dr. Youssef B. Chehade is the owner of a parcel of residentially zoned land situated in the town of Boylston. The land, comprising approximately 148 acres, lies along, northerly of and uphill from the Boylston-Shrewsbury town line and abuts developed residential subdivisions located within Shrewsbuiy. The plaintiff acquired this property by deed from Polito Development Company, dated November 16, 1989, which was subject to the terms and provisions of a certain Restriction and Option Agreement. (Exs. 31 and 32.) The plaintiffs, Anthony A. Froio, Paul G. Roy, Rochelle Johnswold, Katherine E. Coleman, Kurt Binder, Daniel Kilpatrick, Kathryn Ermilio and Robert H. Ryan (“Shrewsbuiy plaintiffs”) own and reside at residential properties in Shrewsbuiy, in close proximity to or directly abutting the proposed subdivision, and are interested parties thereto, pursuant to M.G.L.c. 41, §8IBB.
2. Defendants, Cheiyl J. Morrill, Howard Drobner and Richard Baker were, at all material and relevant times, residents of the Town of Boylston, Massachusetts and members of the Boylston Planning Board who acted on the proposed subdivision pursuant to M.G.L.c. 41, §81BB. Section 6.1.0 of the Town of Boylston’s Rules and Regulations Governing the Subdivision of Land provides, as to the Authority of the Planning Board, “[t]he Planning Board shall be the administrative agency of these regulations, and shall have all the powers assigned them by Section 81A to 81GG, inclusive of Chapter 41 of the Mass. General Laws.” The Defendant, Nancy Von Hone is an individual residing at 616 Edgebrook Drive, Boylston, Massachusetts, and was, at all material and relevant times, Chair of the Boylston Board of Health (the “Board of Health”), who also acted on the proposed subdivision pursuant to M.G.L.c. 41, §81U.
3. Without an approval under subdivision control law and procedures, the parcel in question cannot be developed for single-family use since the parcel lacks the necessary minimum frontage for building lots required by the Zoning By-law of the Town of Boylston.
4. In 1995, Chehade engaged Thompson-Liston Associates, Inc. (“Liston”), a civil engineering firm, to design potential development plans for the subject land. Liston conducted surveys, wetlands analyses, soil testing and other engineering studies of the land. Between 1998 and 1999, Liston presented a number of conceptual development plans for the property to the Boylston Planning Board, including an “over-55" cluster development. In August 1999, on behalf of Chehade, Liston filed a definitive plan entitled ’’Barnard Hill" with the Boylston Planning Board, (“Board”), for approval under the Subdivision Control Law, G.L.c. 41, §§81K et seq. This plan, which is the subject of the instant appeals, subdivides the 148-acre parcel by the creation of 42 numbered residential lots and four lettered parcels designated as Parcels A through D on the Plan. (Ex. 1.) Parcels A, B and C are not proposed for present or future development. Parcel D has been reserved for future subdivision into approximately three large estate lots.
5. With the exception of a small comer of land in Parcel B which is located across the line into Shrews-buiy, the subdivision and all of the lots and ways comprising the Barnard Hill subdivision are located entirely in Boylston. Much of southerly boundaiy of the property abuts the Shrewsbuiy town line adjacent to subdivision developments which were approved by the Shrewsbuiy Planning Board during the past two decades, with some of the Shrewsbury lots, especially along the southern edge of Parcel D, appearing to extend into Boylston. The Shrewsbuiy developments adjacent to the proposed subdivision were built along and off Colonial Drive, a mile-long, dead end street which extends eastward from State Route 140, and which is roughly parallel with Interstate Route 290 and the Boylston/Shrewsbuiy town line. At least 150 *438 homes are located in the Colonial Drive neighborhoods and ways on and off Colonial Drive.
6. During the planning stages of the Barnard Hill subdivision, Chehade and Liston became aware of opposition by Shrewsbury abutters to any connection of the subdivision ways to roads in Shrewsbury. At least in part due to this opposition, Liston filed a definitive plan in the spring of 1999 that proposed vehicular access only from Cross Street to Perry Road in Boylston. Approval of such a plan would have required a waiver from the Board’s rules limiting the length of dead-end streets to 500 feet. (Ex. 2: Section 4.2.5.a.) During the submittal and hearing process, the Board informed Liston that it would not approve a waiver from the dead-end street limitation contained in its Rules and Regulations and that approval would require a second means of egress into and out of the subdivision. A number of Shrewsbury residents, including the Shrewsbury plaintiffs, objected to the proposed connection of the development to Jacobson Drive.
7. In response to the Board’s concerns about a single-access development, the definitive plan proposed a second means of access via Jacobson Drive. Jacobson Drive is a paved, public way in the Town of Shrewsbury, that extends northerly from Colonial Drive and terminates at a dead-end at the southerly boundary of the Chehade land at the Boylston/Shrewsbury town line. Jacobson Drive was laid out and approved as a subdivision way in 1981 by the Shrewsbury Planning Board. (Ex. 5.) Jacobson Drive was later constructed and was accepted and taken as a public way by the Town of Shrewsbury in 1990. (Ex. 3, 4.) Other means of access were available to the designer at Liberty Tree Lane and Cobblestone Way.[2]
8. Following several public hearing sessions on the Developer’s final Subdivision Plan on January 3, February 7, March 6 and April 3, 2000, the Board voted 3-0 to approve the Barnard Hill Plan subject to conditions. The Board filed a Certificate of Approval, dated April 24, 2000, with 24 numbered conditions attached, with the Boylston Town Clerk, on April 25, 2000. (Ex. 13.) In May 2000, within the twenty-day appeal period, the Abutters and the Developer filed separate appeals of the Planning Board’s Certificate of Approval pursuant to M.G.L. 41, §81BB and the Planning Board Rules and Regulations Governing the Subdivision of Land with this Court (the “Planning Board Rules and Regulations”) (Ex. 2) and the Land Court Department of the Trial Court, each of which have been consolidated in this Court and assigned the separate docket numbers referenced above.
B. Findings of Fact Specific to Septic Design Issues
9. In or about November and December 1999, the Developer, by and through Thompson-Liston, pursuant to the requirements of G.L.c. 41, §81U, submitted the subdivision plan to the Board of Health for review and comment, particularly as it related to the proposed clustered septic system scheme contained in his Subdivision Plan. This plan contains only seventeen (17) lots which are “conventional” in design, i.e., lots that are generally square or rectangular in shape, within which the septic leach fields are entirely located and which are within sight distance of the proposed home on the lot.[3]
10. The Developer’s Subdivision Plan proposes to cluster sixteen individual septic leach fields in the southwest area of the Subject Property, behind the existing Jacobson Drive and the homes owned by Abutters Kilpatrick, Ermilio and Binder (the “Jacobson Leach Fields”). In addition, the subdivision plan also proposes to cluster ten septic leach fields in the northeast area of the Subject Property (the “Parcel D Leach Fields”) adjacent to Parcel D, which is a twenty-eight (28) acre area of land in which only one residence is proposed in the Subdivision Plan by the Developer.[4]
11. The plan proposes to connect the leach fields clustered in either the Jacobson area or the Parcel D area to the homes they service by individual, narrow elongated extensions of the lots. The elongation or “rat tail” portion of the twenty-six lots shown on the subdivision plan are each approximately ten (lOj feet in width, and are intended solely to contain piping connecting the septic chamber located near the proposed residence to either the Jacobson Leach Fields or the Parcel D Leach Fields. These narrow lot extensions, extending from the rectangular portion of the lot upon which a house is intended to be built, together with septic tank, to the leach field that is intended to service it, extend in length to approximately a quarter mile in some cases (lots 12, 37, 25 and 26), and several others in excess of 900 feet in length (lots 27, 28, 30, 39 and 41), all of which terminate in the Jacobson Leach Fields. (See exh. 1, sheets L-6 and L-7.) It is clear that several of the leach fields will not be visible from the homes they serve and, given the clustering of piping corridors and leach fields, it will be difficult to distinguish one from another after backfilling and vegetative growth occurs. There are as many as six piping corridors clustered together and running parallel at one point behind lot 32, three lots (42, 43 and 31) are bounded on two or more sides by one or more piping corridors servicing other lots and five lots (10, 39, 41, 27, and 32) have the piping for another’s septic system along one boundary. Several of these piping lanes have in excess of five course changes and with the piping lanes in the southwest cluster (lots 12, 37, 39, 41 and 43) making an approximate 180 degree shift in direction. Additionally, the leach fields for seven lots are shown to abut the intended extension of Jacobson Drive.
12. According to the Director of Public Health for the Town of Shrewsbury, the failure of a leach field is caused by oversaturation with the effluent typically *439 finding its way to the surface and emitting noxious odors from human waste bacteria. Failure can also occur when pipelines leak or rupture. With a conventional septic system design, the owner will usually become the first to observe a failure and be motivated to make all necessary repairs with all due expediency.
13. These proposed septic systems, like all others, will eventually fail. However, unlike conventional systems, the owner of homes herein that are serviced by such a “rat tail” design feature will be unlikely to observe conditions of failure or be able to recognize or relate the failure to his or her ownership, whereas the abutters to the Jacobson Leach Fields will likely be the first to experience odor, saturated soil conditions, and perhaps, septic pollution onto their property when these leach fields fail. Nine of these leach fields are concentrated in an area due north and directly over the town line from the property of one plaintiff abutter, Kilpatrick, and seven are in a similar area across the town line from Ermilio.
14. The design employed by the Developer in the Subdivision Plan is unconventional, has no precedent in the Towns of Shrewsbury[5] or Boylston, and is not the only design available to the Developer. The designing engineer, Thompson-Liston, admitted at trial that the Subject Property could support septic systems and leach fields in other areas in addition to the Jacobson Leach Fields and Parcel D Leach Fields areas. The Developer, through his designing engineer, Thompson-Liston, admitted at trial that the Jacobson Leach Fields could be moved to other areas on the Subject Property, including at least three other areas within Parcel D, but at the Developer’s risk of a reduction in the number of available lots in the Proposed Subdivision. It is clear that the proposed septic design was necessitated by poor soil absorption in the area of the subdivision closest to Shrewsbury, since, with the exception of lots 22, 38 and 40, all of the lots designed without this “rat tail” design are located in the northernmost portion of the subdivision (lots 1-9, 11, 13, 20 and 21).
15. In response to concerns raised by the abutters to the “rat tail” lot design for the Jacobson Leach Fields, the Developer filed with the Board of Health draft documents entitled “Grant of Title 5 Covenant And Easement” and “Declaration of Trust — Barnard Hill Homeowners’ Association Trust” (hereinafter the “Proposed Homeowners Documents”). (Ex. 36.) The Proposed Homeowners Documents were never approved by the Board of Health. In any event, the Proposed Homeowners Documents do not provide for DEP oversight, or for any financial assurance mechanism to ensure effective long-term operation and maintenance of the “rat tall” septic design. (Ex. 36.) Furthermore, the Developer, Chehade, did not include himself as an obligor under the Proposed Homeowners Documents. (Ex. 36.)
16. On August 25, 1999 and March 2, 2000 respectively, the Board of Health wrote letters to the Planning Board indicating that following review of the Developer’s Subdivision Plan and a public meeting with the Developer and his agents, it could “neither approve, nor disapprove” the Subdivision Plan: although the report stated that it had “concerns about the proposed locations of septic systems for some of the lots,” the Board acknowledged that based upon soil test data performed, “. . . the project can support septic systems.” The Board further stated that “[bjeyond that, we can neither approve, nor deny, the application.” (Ex. 14.) By further correspondence dated March 2, 2000, the Board again reported to the Planning Board that while it could not approve or disapprove the subdivision given the lack of septic design plans, soil testing data indicated that the parcel could support septic systems and it would consider any application which met the requirements of Title 5 and the Board of Health’s Rules and Regulations. (Ex. 15.) Although G.L.c. 41, §81U and the Board’s Rules contemplate that a Board of Health will affirmatively approve a subdivision or disapprove it for stated reasons, Morrill testified that it was the usual practice of the Boylston Board of Health to write letters such as was received in the instant case; i.e. neither approving nor disapproving the plan.
17. There is an intermittent stream which forms during the winter and spring, or during heavy rain periods, that originates and flows out of a wetlands area within the Subject Property, uphill from and behind the homes owned by abutters, Kilpatrick and Binder, and at the property lines of the Kil-patricks/Binders and the Subject Property owned by the Developer. This stream follows a sunken trail marked on a US Geological Survey Map. (Exs. 43 and 44.) The proposed location of the Jacobson Leach Fields is directly in the path of this intermittent stream. The Developer’s design engineer, Thompson-Liston, conceded that no subsurface analysis has been done in the vicinity of the Jacobson Leach Fields, no tests performed to determine groundwater flow in vicinity of the Jacobson Leach Fields, no monitoring wells installed around the Jacobson Leach Fields nor soil borings done to determine the hydraulic conductivity of the soil in the vicinity of the Jacobson Leach Fields.
C. Findings of Fact Specific to Traffic Issues
18. During the Board’s hearings, there was much discussion and focus on the adequacy of several intersections outside the proposed subdivision, especially that of Colonial Drive and Route 140 (“Colonial Intersection”). Indeed, this intersection was the primary focus of Condition 23, one of the two contested by the developer. Condition 23 of the Board’s decision, Exhibit 13, provides as follows:
Due to the Board’s findings that the subdivision directly affects roadways wholly within the Town of *440 Shrewsbuiy, and due to the applicant’s own conclusions submitted via traffic reports, that the Colonial Drive/Rte 140 intersection will be a failing intersection, which, in the Board’s opinion requires mitigation measures. Therefore, in accordance with Section 4.1.5 of the Town of Boylston Subdivision Rules and Regulations, Applicant shall receive certification from the Town of Shrewsbuiy Planning Board, prior to construction of any portion of the subdivision, as to the following.
a) Access to the subdivision is in accordance with the Master Plan of the Town of Shrewsbuiy.
b) Access to the subdivision is in accordance with the subdivision rules and regulations of the Town of Shrewsbuiy.
c) Access to the subdivision at the Colonial Drive/Route 140 intersection is adequately improved to handle the prospective traffic.
Certification by the Shrewsbuiy Planning Board is limited to the above items only.
Any improvements issued by the Shrewsbuiy Planning Board shall be constructed and the cost thereof to be bourne [sic] at the sole expense of the applicant and to be completed contemporaneously with the construction of the roadway of phase I of this subdivision, and shall be completed prior to obtaining an occupancy permit.
19. The Colonial Intersection is located entirely within the Town of Shrewsbuiy, approximately one-half mile from the intended subdivision entrance, at Jacobson Drive. The proximity of this intersection to the entrance and exit ramps to Interstate Route 290 causes delays at the end of Colonial Drive at Rt. 140, particularly during peak hours due to traffic volume and excessive speed on Rt. 140. It is not uncommon for several vehicles to be backed up on Colonial Drive awaiting entry onto Rt. 140, particularly those intending a left turn southbound on Rt. 140 during peak traffic hours, and motorists[6] will often have difficulty in exiting Colonial Drive onto Rt. 140 at these times, sometimes provoking impatience in operators of vehicles exiting Colonial Drive which can result in their imprudent cutting into the Rt. 140 traffic. Nevertheless, it was largely uncontested that mitigation or improvement measures are warranted for this intersection whether the instant subdivision is built or not.
20. The Planning Board’s consultant, Graves Engineering, Inc., advised the Planning Board that:
The existing conditions for Colonial Drive and Route 140 are a level of service E ‘Unstable Flow’ (AASHTO). However, the average delays predicted for the year 2003 for both the No Build and Build Conditions are level of service [“LOS”] F with average vehicle delays greater than 300 sec/vehicle. Delays exceeding 60 seconds typically are cut off with unsafe traffic movements.
(Ex. 47.)
21. In addition, the delay of vehicles exiting Colonial Drive onto Rt. 140 causes a ripple effect on the next proximate intersection on Colonial, that of Colonial Drive and School Street, resulting in a line of vehicles extending to and through the Colonial Drive/School Street intersection sometimes blocking access to School Street. This intersection suffers from the additional problems of a stop line on the south bound approach on School Street at the intersection of Colonial Drive being located too far back from the intersection to provide adequate visibility for motorists at that location and that the vegetation in the northeast corner of the Colonial Drive/School Street intersection limits motorist visibility, adding to an unsafe condition.
22. At the Board’s request, Chehade commissioned traffic studies of the Colonial intersection. The studies concluded that the intersection operated at a deficient level of service in the morning peak traffic hour. The delays were experienced by vehicles attempting left hand turns from Colonial Drive onto Route 140. The period of time in which the level of service was deficient was limited to approximately one (1) hour each morning. (Ex. 21, 38, 40.)
23. The Colonial Intersection is under the jurisdiction and control of the Massachusetts Highway Department (Mass Highway) since it is within the layout of the Route 290/140 interchange. (Ex. 16, 7.) Prior to the Board’s decision, Mass Highway officials met with traffic engineers retained by Chehade (Ex. 27), as well as a number of Shrewsbuiy abutters. Additionally, the Board communicated with Mass Highway during the hearings. (Ex. 41.) On Februaiy 4, 2000, the Commissioner of Mass Highway communicated to plaintiff Froio that he would have his staff review the Colonial intersection to “review the intersection . .. [and] focus on determining the need for and feasibility of providing improvements .. .” (Ex. 7.) By letters dated March 13, 2000, District Highway Director Thomas Waruzila informed plaintiffs Froio and Kilpatrick that “investigation has disclosed no safety problems or excessive accidents at this location, warning signs had been erected at approaches to the intersection and that Mass Highway would closely monitor the intersection due to the existence of proposed developments that would add increased traffic. (Ex. 8, 48.)
24. Chehade engaged traffic engineers to study and evaluate potential mitigation measures to improve the level of service of the Colonial Intersection. (Ex. 40.) One of the potential measures identified by the BSC Group to alleviate delays caused at the intersection was to restrict left turning movements out of the intersection. On Februaiy 14, 2000, the Shrewsbuiy Town Manager informed the Boylston Planning Board that the Shrewsbuiy Selectmen opposed any action by Mass Highway that would restrict left turning movements at the Colonial Intersection. (Ex. 6.) BSC Group also expressed the opinion that if mitigation was put *441 in place at the Colonial Drive/Rt. 140 intersection, peak period level of service at this intersection would improve from LOS F to LOS A even with the construction of the Developer’s Proposed Subdivision. (Ex. 40, ¶4.3, Table 3.)
25. On Colonial Drive, as it approaches Rt. 140, only a single lane currently exists. The abutters’ traffic engineer, Bruce Campbell & Associates, recommended the construction of an exclusive left turn lane servicing vehicles on Colonial Drive awaiting entrance onto Rt. 140 southbound, thus providing two lanes on Colonial Drive as it approaches Rt. 140. In addition, as opined by the abutters’ traffic engineer, a review of the Massachusetts Highway Department for right-turn lanes reveal that a Rt. 140 northbound turn lane onto Colonial Drive is warranted. (Ex. 53, p. 6.)
26. Massachusetts Highway Department will not institute any substantial mitigation or improvement measures to the Colonial Drive/Rt. 140 intersection without the express approval of officials in the Town of Shrewsbury. The Town of Shrewsbury is willing to discuss with the Developer reasonable improvements and mitigation measures to the Colonial Drive/Rt. 140 intersection. The Developer has not appeared before the Town of Shrewsbury’s Planning Board, Town Manager, or any other Shrewsbury board or official for purposes of discussing or evaluating improvements or mitigation measures at the Colonial Drive/Rt. 140 intersection.
27. Regarding another intersection that was discussed during the hearing, the Board requested that Chehade submit a proposed design for off-site improvements to the intersection of School Street/Route 140, located in Boylston, also approximately one half mile from the subdivision but closer to its intended entrance at Perry Avenue. Liston submitted correspondence and plans on March 24 at the Board’s request; the plan suggested that no change was necessary based upon traffic studies by Abend Associates and BSC Group. (Ex. 17.) Nonetheless, Condition 22 of the Board’s decision[7] required that Chehade construct the proposed improvements to the School Street intersection set forth in Liston’s March 24 correspondence, at the plaintiff s sole cost and expense. (Ex. 13.) Plaintiff filed a timely appeal from the condition.
RULINGS OF LAW
The parties contend that the decision of the Boylston Planning Board exceeded its authority. They have standing to assert an appeal of the Planning Board’s Certificate of Approval in this Court as aggrieved by the decision of the Planning Board within the meaning of M.G.L.c. 41, §81BB. “In reviewing appeals brought pursuant to G.L.c. 41, §81BB, the trial judge hears the matters de novo, making independent findings of fact and, on the facts so found, determines whether the plan submitted to the planning board conforms to the reasonable rules and regulations of the board.” Rettig v. Planning Bd. of Rowley, 332 Mass. 476, 478, 479 (1955); Batchelder v. Planning Bd. of Yarmouth, 31 Mass.App.Ct. 104, 106 (1991). The court’s de novo review is limited to determining whether the planning board’s decision exceeded its authority. Strand v. Planning Board of Yarmouth, 31 Mass.App.Ct. 104, 106, 575 N.E.2d 366 (1991). “While the trial judge may not substitute his or her own judgment for that of the planning board, see, Strand v. Planning Bd. Of Sudbury, 5 Mass.App.Ct. 18, 21 (1977), the Board’s decision will not be sustained where it has acted outside of its authority under the subdivision control law.” However, the courts have also noted that a certain amount of deference should be given to the planning board’s decision:
If . . . reasonable minds might in good faith differ . . . the conclusion reached by the planning board should be sustained . . . and the role of the courts is merely to ascertain whether the board exceeded its authority. Arrigo v. Planning Board of Sudbury, 5 Mass.App.Ct. 18, 21 (1977); Douglas v. City of Malden Planning Board, Land Court Case No. 236452. [Emphasis added.]
The purpose of the subdivision control law, as stated in G.L.c. 41, Sec. 81M, is for:
protecting the safety, convenience and welfare of the inhabitants of the cities and towns in which it is, or may hereafter be, put in effect by regulating the laying out and construction of ways in subdivisions providing access to the several lots therein, but which have not become public ways, and ensuring sanitary conditions in subdivisions . . . The powers of a planning board . . . under the subdivision control law shall be exercised with due regard for the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; for lessening congestion in such ways and in adjacent public ways; for reducing danger to life and limb in the operation of motor vehicles; for securing safety in the case of fire, flood, panic and other emergencies; for insuring compliance with the applicable zoning ordinances or bylaws; for securing adequate provision for water, sewerage, drainage, underground utility services, fire, police, and other similar municipal equipment .. .; and for coordinating the ways in a subdivision with each other and with the public ways in the city or town in which it is located and with the ways in neighboring subdivisions ... It is the intent of the subdivision control law that any subdivision plan filed with the planning board shall receive the approval of such board if said plan conforms to the recommendations of the board of health and to the reasonable rules and regulations of the planning board pertaining to the subdivision of lands; provided however, that such board may, when appropriate, waive, as provided for in section 81R, such *442 portions of the rules and regulations as is deemed advisable . . .
Approval of a subdivision plan involves procedures, including a public hearing (G.L.c. 41, §81T) as well as open sessions of the planning board at which the proposed division of a tract of land into smaller lots is carefully reviewed so as to meet design criteria and certain policy objectives relating to streets (emphasis on maximizing traffic convenience and minimizing traffic congestion), drainage, waste disposal, catch basins, curbs, access to surrounding streets, accommodation to fire protection and policing needs, utility services, street lighting, and protecting access to sunlight for solar energy. Hamilton v. Beverly, 35 Mass.App.Ct. 386, 388. See G.L.c. 41, §81M, North Landers Corp. v. Planning Bd. of Falmouth, 382 Mass. 432, 435-37 (1981). The subdivision control process contemplates a “dialogue between board and developer” and “exhortative give-and-take,” i.e., a working out of difficulties and solutions less rigid than the zoning process. North Landers Corp. v. Falmouth, id. at 445-46; Meyer v. Westport, [id. at p.) 170. This process is authorized by statute G.L.c. 41, §81S, which provides as follows: “. . . Within foriy-five days after submission of a preliminary plan, each board shall notify the applicant and the clerk of the city or town, by certified mail, either that the plan has been approved, or that the plan has been approved with modifications suggested by the board or agreed upon by the person submitting the plan, or that the plan has been disapproved and in the case of disapproval, the board shall state in detail its reasons therefor.”
If a definitive subdivision plan conforms with the board’s rules and regulations and with the recommendations of the board of health, the planning board has no choice but to approve the definitive plan. Board of Selectmen of Ayer v. Planning Board of Ayer, 3 Mass.App.Ct. 545 (1975). Rules and regulations are to be specific enough for the applicant to know in advance what needs to be done in order to get the plan approved. Planning board regulations which are too vague to meet this test cannot be used as a basis for disapproving a plan. See, Castle Estates, Inc. v. Park & Planning Board of Medfield, 344 Mass. 329, 334, 182 N.E.2d 540, 545 (1962) (subdivision regulations must be comprehensive, reasonably definite and carefully drafted, so that owners may know in advance what is or may be required of them). Planning board rules and regulations have been deemed to satisfy the Castle Estates standard so long as they are “reasonably definite.” In Mac-Rich Realty Const. v. Planning Board of Southboro, 4 Mass.App.Ct. 812, 819-20 (1976), the planning board cited inadequate widths of pavement and rights of way as reasons for disapproval. Id. The developer appealed, contending that it had no notice of this requirement. Id. at 83. The Appeals Court disagreed, citing the regulation stating that “[gjreater width shall be required by the Board when deemed necessary for present and future vehicular travel.” Id. Furthermore, the Appeals Court emphasized that
These provisions give adequate notice that the board may, in its discretion, require greater widths ... As the Castle Estates case makes clear, it is enough if a regulation gives ample notice of “what is or may be required.”
Id. at p.83.
I. Rulings of Law Specific to Traffic Issues
The developer contests the validity of Conditions 22 and 23 to the definitive subdivision approval as being beyond the scope of the authority vested in the Planning Board under the Subdivision Control Law. The abutters contend that the Board, by imposing merely these two conditions (which they support), did not go far enough, contending that the approval exceeded its authority as a matter of public safety and that the plan either should not have been approved, or that other remediation measures should have been required at other intersections and that access to the subdivision from the Shrewsbuiy side should have been altered.
The “Purpose” clause of the Town of Boylston’s Rules and Regulations Governing the Subdivision of Land essentially mirrors G.L.c. 41, §81M:
The powers of a Planning Board . . . under the Subdivision Control Law shall be exercised with due regard for the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; for lessening congestion in such ways, and in adjacent public ways; for reducing danger to life and limb in the operation of motor vehicles; . . . and with the public ways in the Town of Boylston, and with ways in neighboring subdivisions.
Among pertinent sections of the Town of Boylstoris Rules and Regulations Governing the Subdivision of Land are the following:
(1) Section 2.1.22 defines “Subdivision,” and includes the phrase “having in the opinion of the Planning Board sufficient width, suitable grades, and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of land abutting thereon, or served thereby . . .”
(2) Section 3.1.2 provides, as to the contents of a Preliminary Plan, “Location of existing or proposed streets of record on abutting property which can practically be connected to streets within the proposed subdivision,” and, in Section 3.2.2: “. . . showing the entire subdivision and adjacent streets with dimensions of the lots, and streets, and lot numbers.”
(3) Section 3.2.2(h) provides, as to the contents of a Definitive Plan, “Location, general direction, names and present widths of streets or ways bounding, approaching, or within reasonable proximity of the subdivision, showing both roadway widths, and right-of-way widths.”
*443 (4) Section 3.2.8 provides that “The Board may, as a condition of granting a permit under MGL Chapter 41, Section 81-Y, impose reasonable requirements designed to promote health, convenience, safety, and general welfare of the community, and to benefit the Town...”
A. Whether the Approval Was Unreasonably Conditioned Upon Factors Outside the Subdivision
Turning first to the developer’s challenge of Conditions 22 and 23, Chehade alleges that the Board exceeded its authority by its direct order to the developer to make improvements to the Rt. 140/School Street intersection (Condition 22), and by its indirect order to him, through reference to the Shrewsbury Planning Board, to make improvements to the Rt. 140/Colonial Drive intersection (Condition 23) claiming that the Board’s impositions of these conditions were motivated on factors generally related to community concerns, rather than on'factors within the proper scope of the Subdivision Control Law.
In relevant part, G.L.c. 41, §81M states:
. . . The powers of a planning board . . . under the subdivision control law shall be exercised with due regard for the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; for lessening congestion in such ways and in adjacent public ways;. . . and for coordinating the ways in a subdivision with each other and with the public ways in the city or town in which it is located and with the ways in neighboring subdivisions . . .
[Italics added.] As already noted, the general purpose clause of the subdivision rules and regulations of the Town of Boylston closely adheres to this legislative purpose; however, there is a subtle but not insignificant omission of the phrase emphasized above from the Boylston statement of purpose. This omission, intended or unintended, is viewed, either alone or together with Section 3.2.8, supra, as a subtle expansion of authority of the Planning Board to evaluate traveler safeiy and convenience on any public way that it believes may be impacted by a proposed subdivision, rather than upon the “adjacent public ways” referenced earlier in the statute and which phrase appears closer to that which provides for due regard for adequacy of “access to all of the lots in a subdivision by ways that will be safe and convenient for travel.” General Laws c. 41, §81Q provides in pertinent part that “a planning board shall adopt . . . rules and regulations ... [that] set forth the requirements of the board . . . which requirements shall be established in such manner as to carry out the purposes of the subdivision control law as set forth in section eighty-one M.” As written, if the cited regulations of the Board and the conditions based thereon are intended to give authority for an evaluation of general issues that may affect public safety in the area, the conditions are viewed as exceeding the proper scope of the legislative purpose of the Subdivision Control Law and the conditions shall be invalidated.
The Board and/or the abutters claim, however, that the intersections in question may be sufficiently proximate to the subdivision in question so as to be within the proper scope of Board consideration. In North Landers Corp. v. Planning Board of Falmouth, 382 Mass. 432 (1981), relied upon by the abutters, the Supreme Judicial Court held that the Subdivision Control Law does permit a planning board to evaluate ways outside a proposed subdivision to the extent necessary to determine sufficiency of access to the subdivision and as they relate to the statutory purpose of the law. Noting that “the issue of whether a planning board has ‘the power to disapprove a subdivision plan due to traffic problems and access problems caused not by any inadequacy of the ways set out on the subdivision plan, but rather by inadequacies in the public ways adjacent to or providing access to the proposed development’ has been explicitly left open,” citing Canter v. Planning Board of Westborough, 4 Mass.App.Ct. 306, 309 (1976),[8] the Court ruled that:
The language of §81M, exhorts a “due regard” for “lessening congestion ... in the adjacent public ways” and “for coordinating the ways in a subdivision with . . . the public ways in the city or town in which it is located and with the ways in neighboring subdivisions” . . . We view the quoted language of the statute to be clear . . . Section 81M imposes no such circumscriptions as North Landers urges. The adequacy of Sam Turner Road was properly considered by the judge.
Consideration by the judge of factors pertaining to safety, accessibility, or the increased traffic on Sam Turner Road comports with decisional law in this and other jurisdictions. Factors outside the subdivision may be considered where relevant to the requirements of the statute or of local regulations.
Id. at 437.
It should be noted that the subdivision in question had approximately 800 feet of frontage along Sam Turner Road. Likewise, in Rattner v. Planning Board of West Tisbury, 45 Mass.App.Ct. 8, 10 (1998), a case primarily decided on the question of standing, the Appeals Court relied on North Landers in deciding that an opponent to a proposed subdivision had standing as an aggrieved party since direct access into the proposed subdivision was expected along a private unpaved road on which he lived. In so holding, it reaffirmed that a planning board may consider factors outside a subdivision, including those pertaining to safety, accessibility, and traffic, where such factors are relevant to the requirements of the Subdivision Control Law or local subdivision regulations, by stating that: “[i]n light of our determinations that the board had a duty to evaluate the adequacy of certain roads outside the defendant’s proposed subdivision *444 that would be used for access to the subdivision, and that Rattner made a sufficient showing that such use would likely cause injury to his property for purposes of being aggrieved by the Board’s decision, he had standing to appeal that decision. Rattner, at 13. The facts of this case are distinguishable from those of North Landers or Rattner, however.
Unlike Jacobson Drive, or Colonial Drive in the vicinity of Jacobson Drive, neither Rt. 140 nor School Street are adjacent or reasonably proximate to the subdivision. In order for a vehicle to travel to Rt. 140 at this intersection from the subdivision, as presently proposed and approved, it would either have to (1) enter upon Jacobson Drive, then turn right (west) on Colonial, then right (north) on School Street bearing left at the “Y” intersection at Cross Street, and then turning left into the “H” intersection at Rt. 140, a ride of approximately 1 mile and traversing 4 intersections, or (2) leave by way of Perry Road turning left, southbound on Cross Street, then right at School Street and then left at the intersection with Rt. 140, a drive which is shorter than the first route and with one less intersection to negotiate, but no more adjacent to the subdivision. This condition, as it seeks to require an improvement to an intersection which cannot be viewed as adjacent to the subdivision, appears to represent a desire on the part of the Board to require the developer to make a general public safety improvement that would be of more general benefit to the community at large than one that is deemed necessary and which would have a direct bearing upon access to the subdivision or to relieve congestion or improve safely in or about the ways of the subdivision; as such, it is more properly a responsibility of the state or town highway department.
The obligation to maintain public ways is the responsibility of the town once such ways are accepted. Further, the contention of the Shrewsbury plaintiffs and the Board that the best interest of the town or the public interest would be served by requiring that plaintiff “mitigate” off-site traffic impacts is insufficient in the absence of a specific regulation and a closer, more direct relationship with the subdivision. See Daley Construction Co., Inc. v. Planning Board of Randolph, 340 Mass. 149, 156 (1959); Canter v. Planning Board of Westborough, 4 Mass.App.Ct. 306 (1976). Even if the requirements of Condition 22 (and Condition 23, for that matter, discussed below) are alleged to be reasonably based on general public safety concerns, the conditions relating to off-site traffic were beyond the power of the planning board to impose absent a specific regulation. Mac-Rich Realty Construction, Inc. v. Planning Board of Southborough, 4 Mass.App.Ct. 79, 83-86 (1976); Fairbairn v. Planning Board of Barnstable, 5 Mass.App.Ct. 171, 179 (1977); North Landers Corp. v. Planning Board of Falmouth, 382 Mass. 432 (1981). In Mac-Rich, supra, the Appeals Court held that an otherwise proper subdivision may not be disapproved on the grounds of adverse impact of traffic and services as a whole. In Fairbairn, supra, the Appeals Court held that denial of a subdivision based upon a dangerous entrance was not proper since it was not based upon failure of the plan to comply with a specific, published rule or regulation.
Therefore, and for the foregoing reasons, this court agrees that the Board exceeded its authoriiy by the imposition of Conditions 22 and 23, as they were motivated out of concern for factors outside the proper scope of the Subdivision Control Law. Consequently, so much of the decision of Planning Board of the Town of Boylston that required such conditions shall be annulled.
B. Condition 23 and Section 4.1.5 of the Subdivision Rules and Regulations
A discussion of the additional contentions of the developer with respect to Condition 23[9] is necessary, in the event that the court’s ruling in Part A, above, not be sustained on review and the Board’s decision to approve the subdivision conditioned upon improvements to the said intersections is held to be within the proper scope of its authority. The developer contends that the Board exceeded its authority and exceeded the scope of the Subdivision Control Law when it imposed this condition pursuant to the provisions of Section 4.1.5 of the Boylston Subdivision Rules and Regulations, which provides as follows:
In instances where access to a subdivision crosses land in another municipality, the Board may require certification from appropriate authorities in that municipality that such access is in accordance with the Master Plan and subdivision regulations of such municipality, and that legally adequate performance bond has been duly posted, or that such access is adequately improved to handle prospective traffic.
He challenges the validity of Condition 23 on three basic grounds: that (1) it is unreasonably vague or is an unreasonable delegation of authority for approval of a Boylston subdivision to the Town of Shrewsbury, (2) by the express terms of Section 4.1.5, it does not apply to this subdivision and (3) it imposes a requirement upon the developer that is beyond his capacity to comply.
1. Whether the Condition Is Unreasonably Vague and/or Is an Unreasonable Delegation of Authority
In construing subdivision conditions, the courts have held that, at a minimum, the test for vagueness is satisfied when there is ample notice of what is or may be required. Mac-Rich Realty Constr. v. Planning Board of Southborough, 4 Mass.App.Ct. 79, 82-83 (1976). In J&C Homes v. Planning Board of Groton, 8 Mass.App.Ct. 123 (1979), the Court invalidated a condition which required the developer to observe “such conditions which would show due regard for the con *445 cerns expressed at the public hearing." The developer contends that Condition 23 is similarly flawed.
First, the defendant challenges the non-specific nature of the condition as it requests a three-part certification regarding “access to the subdivision” from roadways within the Town of Shrewsbury. While the subdivision plan at bar proposes no new access roads to be constructed in Shrewsbury but will merely connect to Jacobson Drive at the property/town line, the defendant first appears to complain that the condition delegates unlimited discretion to the Shrewsbury Planning Board to evaluate any existing town way or highway in Shrewsbury which could be construed to furnish access to or be impacted by the subdivision; however, as the evidence has shown, there is only a small population of roadways within Shrewsbury to which this condition applies. Notwithstanding the lack of specificiiy in the condition itself, with the exception of the Colonial Intersection, the evidence presented to the Boylston Board, including extensive studies by traffic engineers, clearly identified all potential roads and intersections to which the Board gave its attention and to which this condition would relate, as well providing in rich detail the nature of the traffic problems to which this condition relates. Where the facts show that the applicant had actual notice of the conditions, then the concern expressed in Castle Estates is inapplicable. See, McDavitt v. Planning Board of Winchester, 2 Mass.App.Ct. 806, 807 (1974) (denying Castle Estates challenge because “[i]t is clear that the plaintiffs knew in advance that this would be required of them”). Moreover, the Master Plan and the Planning Board Rules and Regulations of the Town of Shrewsbury are, I infer, a matter of public record and that all of the ways located in Shrewsbury and relevant to this discussion appear to have been accepted as public ways and have already been found to comply with the Master Plan and the regulations of the Planning Board. (See discussion in part 2, infra.) Thus, this issue is perceived as confined to the improvements that the Shrewsbury Board might order with respect to the Colonial Intersection.
By its express terms, the condition does not simply seek an evaluation or recommendation by the Shrews-bury Planning Board of the adequacy of the Colonial Intersection, an intersection located more than V2 mile and three intersections away from the subdivision, but also appears to expect, if not mandate, that the Shrewsbury Board will recommend yet-to-be-determined improvements, based upon unspecified criteria, that the developer will then be required to construct in order to obtain “certification” by Shrews-bury and which is a prerequisite to construction activity on-site.
While it is true that conditions of approval contained in subdivision decisions that are based upon requirements contained in a Board’s regulations, such regulations must be comprehensive, reasonably definite, and carefully drafted, so that owners may know in advance what is or may be required of them and what standards and procedures will be applied to them. Castle Estates, Inc. v. Park and Planning Board of Medfield, 344 Mass. 329 (1962); Fairbairn v. Planning Board of Barnstable, 5 Mass.App.Ct. 171, 177-79. Here, the defendant claims not to find support, from a review of the relevant Subdivision Rules and Regulations of the Town of Boylston (Ex. 2), for an express rule or standard informing an applicant for subdivision approval that he may be compelled to design or pay for improvements to public ways or intersections, or that off-site traffic conditions on public ways may be grounds for disapproval. The rules and regulations are intended to provide specificity and substance to the general purposes of the subdivision control law in relation to the topics of control set forth in [G.L.c. 41], §81M. Beale v. Planning Board of Rockland, 423 Mass. 690 (1996). The regulations promulgated by the Board do not make express reference to the adequacy of adjoining public ways, unlike the Falmouth regulation which had made a specific reference to the adequacy of an off-site roadway discussed in North Landers Corp. v. Planning Board of Falmouth, 382 Mass. 432, 436, fn 4 (1981). However, an intent to evaluate the adequacy of ways approaching, bounding or adjacent or within reasonable proximity to the subdivision is clearly implied and is found within the general purposes of the Subdivision Control Law and of the Town of Boylston Rules and Regulations.
Nonetheless, by requiring that plaintiff obtain a “certification” from the Shrewsbury Planning Board prior to any construction, the Boylston Board has effectively eviscerated its own approval, albeit conditional, by making the continued viability of the plan dependent upon future, potentially unregulated, discretionary and unreviewable determinations of the Shrewsbury Planning Board. The condition clearly requires that prior to the construction of any portion of the subdivision and prior to obtaining an occupancy permit for any structure on any lot, applicant must obtain three independent “certifications” concerning “access” to the subdivision. While both Section 4.1.5 of the regulations and Condition 23 make reference to “certification” by a neighboring municipality, they are silent as to the process for obtaining such “certification.” While due process implies the necessity of fair notice and an opportunity to be heard, this condition only hints at the suggestion of a process, which may or may not include a hearing by or negotiation with the Shrewsbury Planning Board. The condition implies that the Shrewsbury Planning Board, as a part of its certification process, will “issue” “improvements” to the Colonial Drive “access to the subdivision,” which will then require the plaintiff to design, construct and complete such improvements at its expense before any construction of the subdivision itself can be undertaken. As such, the condition appears to violate CasÜe Estates standard by depriving the plaintiff of his right *446 to know: (a) what ways and utilities are or may be required in connection with subdivision plans; (b) what standards are to be applied by.the board in exercising any powers given to withhold approval and to impose conditions; and (c) what those powers are. Castle Estates, supra at 329.
Moreover, neither the regulations nor the condition disclose any procedure for oversight by the Boylston Board of this “certification” procedure or for review of the action or inaction of the Shrewsbuiy Board. Nor has any proponent of the condition identified the source of the authority of the Boylston Board to require “certification” by the Shrewsbuiy Board or which has defined the extent or scope of the “certification” of the Shrewsbuiy Board to “issue” anything other than recommendations to Boylston, rather than directives to the developer. Indeed, the Shrewsbuiy Town Manager, called as a witness for the Shrewsbuiy abutters opposing the subdivision, expressed the view that the certification contemplated by Section 4.1.5 was “permissive” rather than mandatoiy, and which would be a process that should come after definitive approval. (Ex. 22.) The Subdivision Control Law is intended, however, to be a comprehensive statutoiy scheme requiring planning boards to take definite actions within definite time frames. Board of Selectmen of Pembroke v. R&P Realty Corp., 248 Mass. 120 (1964). Section 81U, for example, requires planning boards to hold hearings and make decisions on plans within strict time frames. Absent written agreement by the applicant, failure to act by a board results in the plan being “constructively approved” by the board’s inaction. Condition 23 requires the developer to secure “certification” by the Shrewsbuiy Board which otherwise has no jurisdiction over the plan since none of the subdivided lands or newly proposed ways aré within the geographical bounds of Shrewsbuiy. The developer, therefore, is left with no regulatoiy or stat-utoiy permit remedy, standard of review or right of appeal in implementing the condition.
Closely related to and suggested by the above discussion is the argument of the defendant that Condition 23 is an improper delegation of the authority and responsibility borne by the Boylston Board to take final action upon the application of the property owner by granting to the Shrewsbury Planning Board authority, in effect, to disapprove the subdivision, contrary to the intent of the regulatoiy structure of the Subdivision Control Law to place ultimate approval of a subdivision plan to the Planning Board of that locality. This condition purports to grant extensive discretion to the Shrewsbuiy Board to evaluate “access” to the subdivision and can result in a withholding of “certification” or in a requirement of improvements without regard to limitations or specifications apparent from regulations. The parties have not identified, nor has this court located any appellate case from this jurisdiction that has approved such a delegation of authority or approved such a reference to the counterpart of another municipality for the purposes intended. This is not the same situation nor is it sufficiently analogous to the case of Beale v. Planning Board of Rockland, 423 Mass. 690 (1996), relied upon by the abutters. There, the Rockland Planning Board was affirmed in its decision to look to its own zoning ordinance to deny permission to build, in Rockland, an access road to a planned retail mall on adjacent property across the border in its neighboring town of Hingham. The Rockland Board noted that while the land in Hingham was properly zoned and approved for such a purpose, the land in Rockland was not and it was not required to subordinate the enforcement of its own zoning ordinance to that of the adjoining town. That the Hingham Planning Board conditioned its approval upon Rockland’s approval of the access road was neither an issue in the case, nor does it present the same factual posture as that here, since construction necessary for the project, and the required municipal approval therefore, was to occur in both towns. Here, the entire subdivision is located in Boylston and there is no construction necessaiy or contemplated by the developer in Shrewsbuiy.
It is well settled that upon failure of an applicant to satisfy any condition set forth in a subdivision decision, the plan approval is automatically revoked. Patelle v. Planning Board of Woburn, 6 Mass.App.Ct. 951 (1978). In Campanelli v. Planning Board of Ipswich, 358 Mass. 798 (1970), the Supreme Judicial Court held that in the .absence of an appeal, the owner’s acceptance of a condition makes the condition enforceable “even if the conditions imposed in the agreement could be said not to have been authorized by the Subdivision Control Law.” In Town of Stoneham v. Savelo, 341 Mass. 456 (1960), the Court held that a condition requiring the applicant to upgrade a private way between a subdivision and a public way became enforceable, even where the developer did not own the way, in the absence of an appeal. Hence, even though the plan was ostensibly approved, Condition 23 makes the approval illusoiy.
There were events that occurred during the hearing process of this plan that demonstrate the potential for procedural problems notwithstanding the good faith efforts of a developer to comply with the requirements of Condition 23. During the processing of the Barnard Hill Plan, faced with vocal opposition by Shrewsbury abutters, the Chairman of the Boylston Board invited the Shrewsbuiy Planning Board to participate in a joint meeting. Chairman Morrill testified that the Shrewsbuiy Board declined the opportunity to participate. When the developer again attempted to arrange meetings with Shrewsbuiy officials to discuss traffic concerns, Morgado told the developer to await the decision and then file for "certification.” (Ex. 22.) Without the consequence of “constructive approval,” the mere failure of or refusal to act by the Shrewsbuiy Board would effectively obstruct the developer from complying with the condition and thereby jeopardize *447 the approval of the plan, a result which is unforeseen and that would he contrary to the scheme of the Subdivision Control Law.
Therefore, and for the foregoing reasons, Condition 23 is found to be an unreasonable delegation of authority by the Town of Boylston Planning Board and is unreasonably vague in connection with the standards to be applied in the “certification” process intended thereby. So much of the decision of the Planning Board as requires compliance with Condition 23 is annulled.
2. Whether Section 4.1.5 Is Applicable to Subdivision in Question
The defendant next argues that Section 4.1.5, by its terms, is only applicable in instances where access to a subdivision “crosses land in another municipality.” While admittedly one access to the subdivision is Jacobson Drive, a public way, Section 4.1.5 does not apply to the Barnard Hill plan, according to the developer, since no new subdivision ways are proposed which cross land in Shrewsbury. Construing one or more existing public ways leading to a proposed subdivision from another town as “access which crosses land in another municipality” so as to trigger Section 4.1.5’s applicability is an unreasonable and erroneous interpretation. Section 4.1.5 cannot be reasonably interpreted as permitting a board to require an applicant to obtain certification of existing, publicly owned and maintained ways. The purpose of the subdivision control law, set forth in General Laws, Ch. 41, Section 81M is to: “. . . [protect] the safety, convenience and welfare of the inhabitants of the cities and towns in which it is, or may hereafter be, put in effect by regulating the laying out and construction of ways in subdivisions providing access to the several lots therein, but which have not become public ways . . .” The defendant, therefore, contends that, applied within the context of its statutory authority, Section 4.1.5 is limited to those situations wherein access to newly created lots on a subdivision plan in one municipality depends on private (new or existing) roadways which “cross land” in another adjacent city or town, not existing public ways. That Section 4.1.5 does not extend to existing public ways is evident from the context of its requirements themselves. By its express terms, Section 4.1.5’s inquiry of neighboring town officials is limited to (a) whether a way is adequately bonded for construction, (b) whether the way conforms to subdivision standards and (c) whether the way conforms to the neighboring town’s master plan. These “certifications” are clearly intended to ensure that newly proposed private ways in a neighboring town are laid out and constructed in conformity with the standards for public ways in that municipality. It is undisputed here that Jacobson Drive had been designed to furnish access to the undeveloped Boylston land, had been previously approved by the Shrewsbury Planning Board, constructed, and accepted and maintained as a public way for over a decade. Since the subdivision’s sole access from Shrewsbury is over Jacobson Drive, a way which was laid out and approved as part of a definitive subdivision plan entitled “Colonial Farms” by the Shrewsbury Planning Board, in 1981 and which has been a public way owned and maintained by Shrewsbury since 1990, the defendant concludes that Section 4.1.5 has no applicability to the Barnard Hill Subdivision.
3. Capacity to Make Improvements
Lastly, the defendant argues that the requirement of Condition 23 that plaintiff obtain certification from the Shrewsbury Planning Board as to the adequacy of the Colonial Intersection, a state owned and regulated highway located Vi mile from the subdivision’s entrance, and that plaintiff construct whatever improvements are deemed required by the Shrewsbury Planning Board, far exceeds the lawful scope and intent of the regulation. Additionally, the “appropriate official” within the context of Section 4.1.5 to evaluate the adequacy of the intersection is MassHighway, not the Shrewsbury Planning Board. Planning Boards are vested with specific planning and approval authority for specific types of ways proposed for construction within their own jurisdictions pursuant to G.L.c. 41. Once constructed and publicly maintained, even local ways are not within the jurisdiction of a planning board. To attempt, as the Board did, to subject the Boylston plan to determinations of the Shrewsbury Planning Board concerning the Colonial intersection was particularly inappropriate since installation of traffic signals, controls or alterations at state intersections or on state highways is under the exclusive jurisdiction of the Massachusetts Highway Department pursuant to G.L.c. 85, §2. It is undisputed that MassHighway determined that the intersection was not presently in need of any mitigation measures to handle the prospective traffic from the Barnard Hill Subdivision and communicated these findings to the Board and the plaintiffs.
The defendant finds support in his contention that Condition 23 is invalid for this reason in the case of Sullivan v. Planning Board of Acton, 38 Mass.App.Ct. 918 (1995). In Sullivan, the Massachusetts Appeals Court annulled analogous conditions imposed in a subdivision decision of the Acton Planning Board. Plaintiffs were required to make improvements and restrict access from Route 2A, a state arterial highway. Noting that the “courts have not interpreted the Subdivision Control Law to allow the board to impose a condition the performance of which lies beyond the applicant’s power,” id. at 920 (citations omitted), the Court held that since regulation of curb cuts and excavations onto state highways are the exclusive province of MassHighway pursuant to G.L.c. 81, the conditions were invalid “because they relate to work to be performed based upon a governmental decision beyond the control of [the plaintiff].” Id., at 920.
*448 The court agrees that Condition 23 amounts to an order by the Boylston Planning Board, directly or indirectly, that imposes a requirement upon the developer to make improvements to the Colonial Intersection that neither the Town of Boylston, the Town of Shrewsbury or the developer have the authority to order nor make. Consequently, the condition is annulled.
C. Additional Claims by Abutters as Regards Traffic and/or Access
The abutters contend that the Board exceeded its authority by failing to require the developer to make additional improvements to the School Street/Cross Street intersection, and to the Colonial Drive/School Street intersection. While both are more physically proximate to the intended subdivision, and while the former, like that of the School Street/Rt. 140 intersection discussed above, is within the Town of Boylston, and while the Colonial/School Street intersection is in the Town of Shrewsbury, and while they both suffer from infirmities that would be improved by design changes, it is beyond the power of the Boylston Board to order, for the same reasons as discussed above regarding the School Street/Rt. 140 intersection.
Lastly, with regard to the abutters’ contention that the Planning Board’s approval of this subdivision plan, calling for access by means of Jacobson Drive, rather than by either Liberty Tree Lane or Cobblestone Way, while there is a certain logic to the suggestion that locating such access further along Colonial Drive may have the ancillary effect of causing more vehicles to emerge from the subdivision by the other access road (Perry Road), and thus alleviate some of the stress upon the Colonial Drive/Rt. 140 intersection, it was not beyond the scope of the Board’s authority to approve the subdivision as presented. The plan as approved is consistent with its rules and regulations, whether access is gained through Jacobson Drive or another way along Colonial is not significant as to the issues of safety or convenience, except as it may have an impact on the Colonial/Rt. 140 intersection, which, as is discussed above, is outside the proper scope of the Board’s purview.
II. Rulings Specific to Septic Design Issues
The abutters allege that the approval by the Boylston Planning Board exceeded its authority for its failure to properly take into account its duty to ensure sanitary conditions and adequate provision for sewerage. As previously noted, the legislative purposes of the Subdivision Control Law are as expressed in G.L.c. 41, §81M, which include, in relevant part:
protecting the safety, convenience and welfare of the inhabitants of the cities and towns in which it is, or may hereafter be, put in effect by regulating the laying out and construction of ways in subdivisions providing access to the several lots therein, but which have not become public ways, and ensuring sanitary conditions in subdivisions... The powers of a planning board . . . under the subdivision control law shall be exercised with due regard . . . for securing adequate provision for water, sewerage, drainage, underground utility services, fire, police, and other similar municipal equipment. . .
[Italics added.)
In addition, they claim that the Boylston Board of Health failed to comply with its statutory and regulatory obligation to report an unequivocal approval or disapproval of the septic system design.
G.L.c. 41, §81U requires that within forty-five (45) days after a subdivision plan is filed with the planning board and the board of health, that the board of health:
shall report to the planning board in writing, approval or disapproval of said plan, and, in the event of disapproval, shall make specific findings as to which, if any, areas shown on such plan cannot be used for building sites without injury to the public health, and include such specific findings and the reasons therefor in such report, and, where possible, shall make recommendations for the adjustments thereof. Failure of such board or officer to report shall be deemed approval by such board or officer . . . When the definitive plan shows that no public or community sewer is to be installed to serve any lot thereon, approval by a board of health or officer shall not be treated as, nor deemed to be an approval of a permit for the construction and use on any lot of an individual sewage system; and approval of a definitive plan for a subdivision by a board of health or officer shall not be treated as, nor deemed to be, an application for a permit to construct or use an individual sewage system on any lot contained therein . . .
The subdivision rules and regulations of the Town of Boylston include a section (§3.2.3) that essentially mirrors c. 41, §81U; it provides additionally that “every lot shall be provided with a sewerage system satisfactory to the Board of Health before a building on it is occupied.” The determination of all health issue questions with respect to the disposal of sewage in a subdivision which will not be connected to municipal sewer is vested exclusively in the Board of Health. Fairbairn v. Planning Board of Barnstable, 5 Mass.App.Ct. 171 (1977).
The letters from the Boylston Board of Health to the Planning Board, dated August 25, 1999 and March 2, 2000 are “reports” of the Board of Health in response to the Chehade Subdivision Plan, pursuant to M.G.L.c. 41, §81U. The Board of Health reported, in its first communication to the Planning Board, that it had “concerns about the proposed locations of septic systems for some of the lots,” certainly implying a reference to the unusual “rat tail” plan to accommodate septic systems for houses intended to be located in areas of poor soil absorption.[10] As such, the conclusion of the Board that it can “neither approve, nor disapprove” the Developer’s Proposed Subdivision *449 Plan is not a “failure to report," notwithstanding that the reports failed to either approve or disapprove of the Developer’s Proposed Subdivision Plan. Such a report does not constitute an unequivocal approval pursuant to G.L.c. 41, §81U, upon which the Planning Board can or should base an approval of the Developer’s Proposed Subdivision Plan, in light of its statutory duty of “ensuring sanitary conditions in subdivisions, . ..” and in the exercise of its powers “with due regard ... for securing adequate provision for . . . sewerage . . .’’ Indeed, it would not require a tortured reading of the report to view it as a disapproval. The reports here are sufficiently consistent with those in Loring Hills Developers Trust v. Planning Board of Salem, 374 Mass. 343, 347-48 (1978), and K. Hovnanian at Taunton, Inc. v. Planning Bd. of Taunton, 32 Mass.App.Ct. 480 (1992), notwithstanding that they failed to comply with the express provisions of M.G.L.c. 41, §81U. Therefore, it would be inappropriate to base constructive approval upon such reports.
As was stated in Fairbairn, supra, “the standard to be applied by the board of health in deciding whether to approve or disapprove a plan in whole or in part (or to require the imposition of conditions) is that found in §81U, namely, whether ‘the lots shown on such plan [can] be used for building sites without injury to the public health.’ ” Id. at 182-83. [Italics added.] Notwithstanding that the statute (c. 41, §81U) was amended in 1978, following the decision in Fairbairn, which changed the word “lots” to “areas,” with the statute now stating that the board of health “shall report to the planning board in writing, approval or disapproval of said plan, and, in the event of disapproval, shall make specific findings as to which, if any, areas shown on such plan cannot be used for building sites without injury to the public health,” the impact is the same. The Boylston Board of Health failed to fulfill its statutory obligation when it simply stated, in August 1999, that “based on soil testing performed, data shows the project parcel can support septic systems. Beyond that, we can neither approve, nor deny, the application.” (Ex. 14.) [Italics added.] Its report, in March 2000 (Ex. 15), was likewise deficient, as it did not provide the most critical item of information missing from its earlier report, notwithstanding its statement of future intent to examine the clustering of septic designs, since it continued to refer to the capacity of the parcel to support septic systems disregarding its obligation to provide sufficient information as to the areas within the parcel in which it had already expressed concern for the location of septic systems.
It is true, as the developer points out, and as noted in Fairbairn v. Planning Board of Barnstable, 5 Mass.App.Ct. 171 (1977), that:
. . . When a subdivider submits a definitive subdivision plan to a planning board and a board of health he will seldom be in a position to prove that the requirements of the code will be met with respect to what might ultimately be constructed on each individual lot in his subdivision, even if he expects to do all the construction ... At the §81U stage of a case . . . the board of health would be acting prematurely and unreasonably if it were to take any action with respect to [the state environmental code] other than requiring the planning board to endorse a condition on the definitive plan to the effect that no dwelling shall be built on any lot without first securing from the board of health the disposal works construction permit required by the code.
The situation presented herein, however, is not the same as that in Fairbairn, supra, or in any other case relied upon by the developer. In the case of Massachusetts Broken Stone Co. v. Planning Bd. of Weston, 45 Mass.App.Ct. 738 (1998), a distinction appears to have been drawn between the individual and the systemic:
Individual, on-site disposal systems are permitted under the rules and regulations of the planning board as well as the regulations of the board of health. The question here, unlike K. Hovnanian at Taunton, Inc., supra, is not whether there is any disposal system available, but whether the soil will accommodate a permitted on-site system at the location chosen by a future lot owner, and that depends upon the type of business, the size of the proposed building, and the location of the system. These factors will not materialize until someone purchases a lot in the approved subdivision. At such time as a lot owner proposes construction, the owner will first have to apply for a sewage disposal permit with the board of health in accordance with that board’s regulations, which require ground water and percolation tests. The conditional approval of the board of health was appropriate to the nature of an on-site system.
Since this case involves individual sewage disposal units rather than interconnection of sewer lines to a municipal sewage system, we think it is controlled by our decision in Fairbairn v. Planning Bd. of Barnstable, 5 Mass.App.Ct. at 185, 360 N.E.2d 668, rather than K. Hovnanian at Taunton, Inc., supra. Accordingly, it was premature and inappropriate for the planning board to disapprove the subdivision where the board of health gave its conditional approval.
[Id. at 745-46.)
Here, it is known that the development intends the construction of 4-bedroom homes. It is also known that individual leach fields cannot be located on a majority of the lots in the usual and customary location proximate to the septic tank and that the septic design requires long, narrow piping lanes to connect to the relatively few areas at which soil absorption was sufficient to accommodate leach fields. The overall septic design presented by this case is an issue more significant than the simple sum of the individual systems *450 involved. The Board of Health had sufficient information presented to it, without the need for the developer to present individual septic plans, in order to make a systemic recommendation consistent with its statutory and regulatory public health duty. However, once the planning board grants definitive subdivision approval, and while the number, size and location of the lots can change, per G.L.c. 41, §810, the widths and locations of streets are unchangeable, unless an amendment of the plan is made. More to the point, it is clear from all the evidence that a majority of the locations shown on the plan intended for the construction of houses (24 lots out of 42), do not have adequate soil absorption, thus requiring the unusually long and narrow piping lanes into the areas of the clustered leaching fields. Indeed, the evidence is suggestive that a majority of the entire area of the tract is not suitable for septic systems, given the existence of both wetlands[11] and poor soil absorption in certain areas. Even though the Board of Health expresses a desire to reserve its judgment until the developer is prepared to present individual septic designs, given the potential public health hazard that the clustering of leach fields as intended here may represent, by that point in the process, the municipality may likely have lost its ability, following subdivision approval, to take a broader view of the subdivision septic design, as opposed to the individual system review by the Board of Health.
In certain circumstances, at the subdivision approval stage, the Board of Health, like the Planning Board, may consider the potential impact of such health issues on adjacent properties. United Reis Homes, Inc. v. Planning Board of Natick, 359 Mass. 621, 625 (1971).[12] In all circumstances, however, it may consider the impact within the subdivision. Nevertheless, following subdivision approval, its review is limited to the review of individual applications for installation to ensure that a system complies with 310 C.M.R. 11.00-17.00 (Title V of the State Environmental Code) and that the lot is capable of accepting the system. As was stated in Meyer v. Planning Bd. of Westport, 29 Mass.App.Ct. 167 (1990): “[t]he board of health had made no report to the planning board, and its nonaction stood as constructive approval of the plan, G.L.c. 41, §81U, but none of this would be of consequence because, as we have previously explained, the decisive action of the board of health would occur when building permits for individual lots were sought.” (Id. at 174.) However, Title V is silent as to “clustered” systems and to such “piping lanes.”[13] Even though an engineering solution, previously unanticipated, may have been created to solve a problem heretofore considered insurmountable, the designer should not be able to equate the silence of the regulator for acceptance of the plan, for the fact that the septic plan as proposed herein is not addressed in Title V could be interpreted as a lack of regulatory support for the design. While it is true that, in due regard for the right of a private landowner to develop his property, “if a definitive subdivision plan conforms with the board’s rules and regulations and with the recommendations of the board of health the planning board has no choice but to approve the definitive plan, Board of Selectmen of Ayer v. Planning Board of Ayer, 3 Mass.App.Ct. 545 (1975), nevertheless, the law is not and should not be so unyielding so as to bar the judicious exercise of discretion in the absence of regulatory treatment; the municipal authorities charged with subdivision planning and approval also have the statutory responsibility, pursuant to G.L.c. 41, §81M, of’’ensuring sanitary conditions in subdivisions . . . The powers of a planning board . . . under the subdivision control law shall be exercised with due regard ... for securing adequate provision for .. . sewerage, [and] drainage ..." In the proper exercise of these potentially conflicting responsibilities, the boards cannot be blindfolded from being permitted to consider and decide more than simply whether a proposed design can be built in compliance with regulations; the boards charged with this responsibility must be allowed to decide whether a design as unprecedented and potentially harmful as that presented here ought to be built, in keeping with the law.
This case presents the septic equivalent of the elongated “pork chop” design sought to provide subdivision access described in Gifford v. Planning Bd. of Nantucket, 376 Mass. 801 (1978), and found by the trial court to have been the product of an “obvious attempt to circumvent the purpose intent of the Subdivision Control Law.” Id. at 804. The design herein is similarly radical and unprecedented in the experience of the chair of the Planning Board, the town manager and health director of the Town of Shrewsbuiy and the developer’s own project engineer. It surely warranted more than the customary and equivocal response of the Board of Health.[14]
Given its responsibility to ensure sanitary conditions, and the equivocal “concerns” expressed by the Board of Health without recommendation or explanation, the Board of Health and the Planning Board exceeded their authority under M.G.L.c. 41, §81U, in connection with the subdivision plan in question. The Board of Health failed to comply with said statute by failing to unequivocally approve or disapprove the plan; if by expressing “concerns,” it meant to convey disapproval, it failed to specify the “areas” of the plan which cannot be used for building sites without injury to the public health. The Planning Board exceeded its authority when it approved of the Developer’s Proposed Subdivision Plan without an unequivocal approval from the Board of Health on the Proposed Subdivision Plan or by failing to require the Board of Health to specifically address and more completely and carefully explain its “concerns,” especially in the face of such an unusual and potentially risky septic design. See, Loring Hills Developers Trust v. Planning Board of Salem, 374 Mass. 343, 372 N.E.2d 775 (1978), and K. Hovnanian at Taunton, Inc. v. Planning Bd. of Taunton, 32 Mass.App.Ct. 480 (1992).
*451 Consequently, and for the foregoing reasons, I find that the Planning Board exceeded its authority in having approved the definitive subdivision plan. The decision must, therefore, be annulled and the matter, remanded to the Planning Board of the Town of Boylston, which shall, in turn, recommit the plan to the Board of Health for a report of its “approval or disapproval” to the Planning Board, under the provisions of G.L.c. 41, §81U, and, thereafter, the Planning Board shall take such other actions as required by and consistent with duties and responsibility under the Subdivision Control Law and the subdivision rules and regulations of the Town of Boylston promulgated thereunder, and consistent with this decision.
ORDER FOR JUDGMENT
For the foregoing reasons, a consolidated judgment shall enter in favor of the plaintiffs in civil action nos. 00-0958, 00-0929, 00-01608 and in 00-01606, that annuls the decision of the Planning Board of the Town of Boylston, dated April 24, -2000, approving the definitive subdivision plan ofYoussef Chehade; the judgment shall further order the matter to be remanded to the Planning Board for further proceedings consistent with the decision of the court;
And, for the foregoing reasons, ajudgment shall enter in favor of the plaintiff in civil action no. 00-01607, that annuls that portion of the decision of the Planning Board of the Town of Boylston, dated April 24, 2000, that required compliance with Conditions 22 and 23 thereof, but subject to the judgment in civil action nos. 00-0958, 00-0929, 00-01608 and 00-01606.

 Although the parties have consistently referred to the plan of the Barnard Hill subdivision as calling for “43 lots,” there are only 42 numbered lots (no lot is numbered “24”). It is assumed that the 43rd lot refers to a parcel on which one to three houses may ultimately be built at some time in the future.

Cobblestone Way has not yet been accepted by the Town of Shrewsbury as a public way. It was the subject of an agreement between Chehade and his grantor, made at the time of the conveyance of the land in question in 1989, that it not be extended by Chehade for connection to any development in the subject area for a period of seven years unless the extension ended in a cul-de-sac with no connection to any subdivision streets. Cobblestone Way is located at the far end of Colonial Drive, and its extension into the subdivision area would occur in Parcel D, on which no lots are currently planned. It would require a lengthy and costly road construction effort to connect to the principal subdivision roads.
The evidence is unclear as to the status of Liberty Tree Lane, although it was a part of the same definitive approval as contained Jacobson Drive. Any extension of this way would likely intersect and cut off some of the “rat tails” (discussed, infra, at findings of fact no. 11) from their intended terminus in the Jacobson Leach Field area.

As used herein, “contiguous” is meant to describe a lot that is generally square or rectangular in shape and that all the lot as well as the intended house and its entire septic system is contained within its four sides or boundaries, give or take slight deviation in course. This is to distinguish such a lot from the “rat tail” design of which the abutters complain, which consists generally of a large square or rectangular section, upon which a single family home is intended, a long, angular and narrow (10 feet wide) strip of land within which piping that connects the septic chambers to be located within the larger section with its corresponding leach field that is intended to be placed in a much smaller square or rectangular section at the far end of the elongation, or “tail.” As these terms are used herein, a “rat tail” lot shall be one that incorporates this 10’ wide lane, and notwithstanding some unconventional shapes, e.g., lots 23 and 42, such lots shall be treated as conventional. Accordingly, lots 1-9, 11, 13, 20-23, 29, 38, 40 and 42 are viewed as “conventional.”

Prior to introducing the Proposed Subdivision Plan, the Developer proposed a preliminary plan dated June 12, 1998 (Ex. 37) which showed a “shared” septic system in the vicinity of the Jacobson Leach Fields. The “shared" septic system design involved primary and reserve leach fields shared by several house lots. Unlike the clustered septic systems proposed by the instant plan, “shared systems” are regulated by the Massachusetts Department of Environmental Protection (“DEP”) pursuant to the provisions of Title 5 found at 310 CMR 15.290 et seq. Said regulations require, inter alia, that a developer apply for approval with the DEP for shared systems and that such application seek to satisfy operational, ownership, maintenance and liability concerns. The Developer did not obtain DEP approval of the shared system shown in the Preliminary Subdivision Plan. In fact, the Developer withdrew the preliminary plan entirely. Massachusetts regulations are silent as to the clustering of septic systems as currently proposed by the developer.

The Shrewsbury Town Manager, as well as the Director of Public Health for the Town of Shrewsbury, each expressed opinions that the clustering of leach fields as proposed by the Developer in the Proposed Subdivision Plan violates public policy, would circumvent the protective requirements of a “shared system” under Title V, and is an unreasonably dangerous design. Shrewsbury’s Board of Health Director also wrote to the Board of Health and expressed her specific concerns over the Developer’s Proposed Subdivision Plan in a letter dated September 23, 1998 (Ex 23), and testified that:
1) Locating the soil absorption systems in clusters, in areas which are fairly remote from the lots they serve, is not addressed in Title 5 and therefore neither approved or denied. On many of the proposed lots, the sewer line and the SAS (sic) not be visible to the property owner from his lot.
2) The clustered SAS most closely resemble “shared systems” which are regulated by Title 5.
3) With shared systems adequate provisions for the operation and maintenance, and a mechanism for financial assurance for both, is required.
4) Proposals involving shared systems also bear the burden of having to demonstrate that the design flow from the facilities to be served by the shared system does not exceed the design flow which could have been constructed in compliance with Title 5 without the use of a shared system.

Colonial Drive is on a school bus route and, therefore, school buses must also negotiate this intersection.

Condition 22 states: “Applicant shall at its sole cost and expense construct the improvements to the intersection of Route 140 and School Street, as shown on the ‘Site Plan of Intersection Improvements-Option 3’ and described in correspondence submitted to the Board by letter of March 24,2000 by Thompson Liston Associates, Inc. Said improvements shall be constructed contemporaneous with construction of the roadway of Phase I of said subdivision, prior to the issuance of any occupancy permits. Applicant agrees to work in conjunction with the Highway Superintendent and with the Planning Board’s consultant, Graves Engineering. Applicant shall reimburse the Town for Grave’s Engineering Services.”

The court in Canter anticipated that “[t]he language of §81M [FN2] could be read to suggest that a developer may be required by appropriate planning board regulations to take into account deficiencies in ‘adjacent public ways,’ and the concept of ‘adequate access’ may itself involve consideration of the adequacy of connecting ways.” [Citations omitted.] At pp. 309-10. However, the Canter court was not disregarding the limitations expressed earlier in connection with its interpretation of the legislative purposes of the Subdivision Control Law: “[t]he relevant sections of the subdivision control law as revised in St. 1953, c. 674, §7, and as later amended, have received little judicial interpretation. The decided cases are of slight assistance here. Legislative history, however, affords some guidance to interpretation of certain very general, and somewhat ambiguous, provisions of the law. The 1953 amendments were adopted largely upon the basis of 1953 House Doc. 2249, the report of the special commission on planning and zoning. (See Res. 1951, c. 55, and Res. 1952, c. 89.) Section 81M is, with a minor exception not here important, in the language recommended by the special commission (see its report, pages 27-28) about which it commented (at page 54), ‘Section 81M is wholly new. It states the purposes and objects of the law much as is done in the zoning enabling act, so as both to assure its constitutionality and aid in its interpretation. The only purposes recognized are to provide suitable ways for access furnished with appropriate municipal utilities, and to secure sanitary conditions.’ (Emphasis supplied.) At page 10, the commission listed as two of the principal defects in the then existing statute (to which its attention had been invited by members of the bar).”
“It is not made sufficiently clear that the application of the law is limited to regulating the design and construction of ways in subdivisions, and some well-intentioned but overzealous planning boards have attempted to use their power of approving or disapproving plans of proposed subdivisions to enforce conditions doubtless intended for the good of the public, but not relating to the design and construction of ways within subdivisions . . . The provisions of §81M as enacted are consistent with the statements of the special commission quoted above. The statute’s purpose is to protect ‘the safety, convenience and welfare of the inhabitants ... by regulating the laying out and construction of ways . .. providing access to the several lots . . . and ensuring sanitary conditions . . .' [FN3] The statute lists, among other criteria, principally considerations relating to street design as those to be weighed in the exercise of the powers of a planning board, e. g. ‘the provision of adequate access ... for lessening congestion in such ways ... for reducing danger to life and limb in the operation of motor vehicles ... and for co-ordinating the ways . . . with each other and with the public ways . . .’ Even the consideration of ‘safeiy in the case of fire, flood, [or] panic’ would seem to have primary reference to road design, although the suitabiliiy of lots and ways for use as such with reference to the danger of flooding may be material, a matter which we need not now consider. The general tenor of the entire section shows legislative concern primarily with (a) adequate ways to provide access furnished with appropriate facilities and (b) sanitary conditions of lots ... In view of the strong indications in the special commission’s report (see page 12) that the new statute was designed to ‘clarify . . . language . . . especially . . . where overzealous ciiy planners have attempted to extend their authorify’ beyond the past legislative intention, we should not read into the general statement of legislative purpose in §81M any grant of authorify outside that clearly and specifically given by the statute. In the absence of more explicit statutory language, we interpret the authorify of planning boards under the existing subdivision control law as not permitting disapproval of an otherwise proper plan on the ground that its execution would tax existing water sources.” Daley Const. Co. v. Planning Ed. Of Randolph, 340 Mass. 149, 152-53 (1959).

Condition 23 states: “Due to the Board’s findings that the subdivision directly affects roadways wholly within the Town of Shrewsbury, and due to the applicant’s own conclusions submitted via traffic reports, that the Colonial Drive/Rte 140 intersection will be a failing intersection, which, in the Board’s opinion requires mitigation measures. Therefore, in accordance with Section 4.1.5 of the Town of Boylston Subdivision Rules and Regulations, Applicant shall receive certification from the Town of Shrewsbury Planning Board, prior to construction of any portion of the subdivision, as to the following.
a) Access to the subdivision is in accordance with the Master Plan of the Town of Shrewsbury.
b) Access to the subdivision is in accordance with the subdivision rules and regulations of the Town of Shrews-bury.
c) Access to the subdivision at the Colonial Drive/Route 140 intersection is adequately improved to handle the prospective traffic.
Certification by the Shrewsbury Planning Board is limited to the above items only. Any improvements issued by the Shrewsbury Planning Board shall be constructed and the cost thereof to be bourne [sic] at the sole expense of the applicant and to be completed contemporaneously with the construction of the roadway of phase I of this subdivision, and shall be completed prior to obtaining an occupancy permit."

From the evidence before the court, as well as that presented to the Board of Health, there is no doubt of the intent of the designer that these extensions, or rat tails, are “lanes within which septic drainage piping will be installed from the septic tanks to primary and reserve soil absorption system areas.” (See Ex. 36, letter of Chehade’s counsel to Board of Health, dated November 17, 1999, p. 3, and Ex. 1, sheets G-6 and G-7.)

A large portion of Parcel A appears to contain wetlands and at an elevation lower than that of the closest septic piping lanes in the southwest portion of the plan. (See Ex. 1, sheet G-7.)

While the Supreme Judicial Court has implied that there may be “circumstances in which the planning board might properly substitute its judgment for that of the board of health,” United Reis Homes, Inc., supra, at 625, given the approval by the Planning Board, this court does not have the authorify to decide, at this time, that this is one of those circumstances. The record does not disclose whether the Planning Board gave its approval independently of the Board of Health or whether it believed its decision was dependent upon a perceived “constructive approval” by the Board of Health, and therefore, constrained to approve the plan.

While the applicant submitted to the Board of Health specimen plans, proposed homeowner association documents and other institutional arrangements concerning the future maintenance and operation of septic systems proposed for certain lots described as clustered systems, modeled after Department of Environmental Protection requirements for “shared systems,” neither such agreements, nor any term thereof, are required for the systems proposed by the developer, nor would such a system as that proposed be subject to the jurisdiction of the DEP for its approval or inspection, unlike “shared systems.” (See 310 CMR 15.290 et seq.)

Although G.L.c. 41, §81U and the Board’s Rules contemplate that a Board of Health will affirmatively approve a subdivision or disapprove it for stated reasons, Chairperson Morrill testified that it was the Boylston Board of Health’s usual practice to write letters such as was received in the instant case; te., neither approving nor disapproving the plan.